In the
United States Court of Appeals
For the Seventh Circuit

No. 99-1313

MICHAEL R. KING, MARK D. URBANSKI,
DONALD E. RENFRO, et al.,

Plaintiffs-Appellants,

v.

NATIONAL HUMAN RESOURCE COMMITTEE, INC.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:96CV0907 AS--Allen Sharp, Judge.

Argued May 11, 2000--Decided June 30, 2000

Before COFFEY, EVANS, and WILLIAMS, Circuit Judges.

EVANS, Circuit Judge. In this action, filed pursuant to the Employee Retirement Income Security Act, 29 U.S.C. sec. 1001 et seq., a large number of workers at a stamping plant in South Bend, Indiana, alleged violations in the way their 401(k) plan was handled when the assets of their employer were sold.

The employees who brought the action were members of a collective bargaining unit represented by the United Automobile, Aerospace and Agricultural Implement Workers of America-- the UAW. Their former employer, EWI, Inc., had a 401(k) plan for the collective bargaining unit at South Bend that was administered by Prudential Mutual Fund Services. On April 30, 1996, EWI filed for chapter 11 bankruptcy in the Northern District of Ohio. On August 2, 1996, EWI and Tecumseh Metal Products, Inc. executed an asset purchase agreement for the sale of EWI's assets in South Bend. The sale was approved by the bankruptcy court on September 10, 1996. The agreement provided for Tecumseh to assume the union contract, to maintain a defined contribution 401(k) plan, to receive the account balances for the union members participating in the EWI plan, and to transfer the balances to a plan established by Tecumseh for the funds or to an already existing plan.

Tecumseh did not have the capacity to handle the payroll and benefit issues associated with the large, unionized work force it acquired from EWI. For that reason, on September 3, 1996, it executed a client services agreement with the Human Resource Committee, an affiliate of the defendant National Human Resource Committee (NHRC). The former EWI employees, as employees of NHRC, kept their jobs in the stamping facility at the same rates of pay as before. NHRC also had a pension plan called the H.R. Leasestaff 401(k) Plan, provided by Allmerica Financial Institutional Services, in which it originally intended to enroll the South Bend employees. However, the union and Tecumseh determined that Leasestaff was not, in fact, a suitable plan for the South Bend employees. After negotiations among the union, Tecumseh, NHRC, and Allmerica, a new plan called the Human Resource Committee, Inc. Collective Bargaining Unit 401(k) Plan was formed. The plan was not ready until April 1997, but coverage was made retroactive to November 15, 1996.

The actual transfer of the funds from the old EWI plan had occurred before NHRC and Allmerica were ready to receive them. On November 15, 1996, Allmerica received the account balances from the EWI plan in the amount of $2,661,772, but documentation of the individual accounts was not provided at this time. For that reason, the total amount of money transferred was credited with a short-term interest rate of 5.02 percent through December 31 and then placed in a money market fund from December 31, 1996, through mid-April 1997.

Tecumseh and NHRC terminated their contractual relationship sometime in late September 1997, and workers at the South Bend plant became direct employees of Tecumseh. On October 1, 1997, Tecumseh took over the ERISA plan, and it was "restated" into an Allmerica prototype pension plan.

In part, it is the delay in getting the Human Resources Committee plan set up which the plan participants claim violated their rights under ERISA. One of the things of which they complain is that their assets were not invested pursuant to their individual choices. Also, they allege that nonunion employees at the South Bend plant were given several options regarding their EWI balances, including rolling them into their own Individual Retirement Accounts, but the plaintiff-union employees were not. The employees also say they did not receive information about their funds and did not know until February 1997 whether their employer was Tecumseh or NHRC. The

employees also see a number of things wrong with the way the new fund was set up. First, they claim that NHRC and its president, Edward Gudeman, did not solicit bids other than the one from Allmerica and did not familiarize themselves with the EWI Plan to ensure they were getting a comparable plan. Also, they say that Jeffrey Perlstein stood to benefit from the establishment of the new plan. He was the sales agent NHRC used to acquire the new plan with Allmerica and he was also a founder of NHRC and an insurance broker with offices inside NHRC.

These ERISA allegations are sorted--not entirely successfully--into three counts. Count I alleges a violation of 29 U.S.C. sec. 1103(c)(1), which says that the assets of a plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants . . . and defraying reasonable expenses of administering the plan." Count II is for a violation of 29 U.S.C. sec. 1103(d), which deals with duties upon the termination of a plan and provides that upon termination the assets shall be distributed in accordance with the terms of the plan. Count III alleges a violation of 9 U.S.C. sec. 1104: that the defendants/1 violated their fiduciary duty in the selection of a new plan and in the investment decisions which were made. Specifically, the claim is that the defendants failed to timely effectuate the employees' investment decisions and wrongly invested the assets in a money market fund while the difficulty with the transfer of the records was going on.

Both sides moved for summary judgment in the district court. The motion of NHRC and Tecumseh was granted and judgment was entered dismissing the case against all defendants, including Frank Beardman, an administrator of the EWI plan, who plays no part in this appeal. After the judgment was entered, Tecumseh itself filed a petition for reorganization under chapter 11 of the Bankruptcy Code. The action is therefore stayed as to Tecumseh, 11 U.S.C. sec. 362(a), leaving NHRC as the only appellee before us. We review the decision on summary judgment de novo, keeping in mind that summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

On appeal, the employees raise three issues: whether officials at NHRC were fiduciaries under ERISA; whether they breached their duty; and whether certain evidence regarding damages should have been considered by the district court.

Before we tackle those issues, we will note that some of the employees' claims are undermined simply on the basis of uncontested facts in the record. For instance, there is nothing except bare allegations to indicate that Mr. Perlstein received any benefit, even a commission, from the establishment of the Human Resources plan. Nor is there anything else in the record to show any violation of the anti-inurement provisions of ERISA. Thus, Count I fails.

Also, the employees claim that they should have received their funds so that they could invest them as they pleased when the plan was terminated. But the facts show that what happened was not a plan termination; it was a spin-off to a new plan. The employees remained employed at the same jobs as before, and at the same location. The only difference was that they were employed by a different entity. Spin-offs and transfers of assets from one qualified plan to another are allowed under both the Internal Revenue Code and ERISA. See 26 U.S.C. sec. 414(I), 26 C.F.R. sec. 1.414(I)-1, and 29 U.S.C. sec. 1058. Furthermore, a spin-off is what was contemplated in the asset purchase agreement and the order approving it; plus, the union contract required the establishment and maintenance of a pension plan. Additionally, there are specific provisions in the code regulating when assets may be distributed to participants or beneficiaries and this was not one of them. See 26 U.S.C. sec.sec. 401(k)(2)(B)(i) and 401(k)(10)(A).

Which brings us to whether NHRC was acting as a fiduciary when it set up the Human Resources plan. The short and well-established answer is that it was not. It is clear that a person can be a fiduciary for some purposes but not others. See Lockheed Corp. v. Spink, 517 U.S. 882 (1996); Hughes Aircraft Co. v. Jacobson, 119 S. Ct. 755 (1999); Ames v. American National Can Co., 170 F.3d 751 (7th Cir. 1999). It is also clear that the defined functions of a fiduciary do not include plan design, the amendment of a plan, or the termination of a plan. Ames; McNab v. General Motors Corp., 162 F.3d 959 (7th Cir. 1998). This is not the first time we have considered this issue in the context of a spin-off and the attendant dissatisfaction with transitional plan provisions. In Ames we said:

Plaintiffs wish that ANC had designed its transitional programs so that their group would be entitled to the bridging benefits given to the corporate staff department, or at least to the extra credit for ANC pensions that the unionized employees won for themselves. But in order to maximize the value of Food Metal when it conveyed that division to Silgan, ANC chose to structure

its plan differently. This is a design decision, not a decision implicating an individual's rights to specific benefits, and as such, ANC was free to make it for business reasons.

At 757. The choice of the Human Resources plan does not implicate NHRC's fiduciary duties.

But, given that an entity can be a fiduciary for some purposes and not others, we could arrive at a different answer when the question involves the administration of the plan, including the investment of the money transferred from the EWI plan. ERISA provides at 29 U.S.C. sec. 1002(21)(A) that:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

Here, when the money was received from EWI and deposited in the money market account, there was no plan, other than the Leasestaff plan, in effect. While some funds were apparently deposited in Leasestaff, the employees' biggest complaint seems to be that the funds were deposited in money market funds, rather than accounts which reflected their individual elections. Even though there was no actual plan in effect when the funds were precipitously transferred, these are pension funds, subject to ERISA, and under the circumstances we think it fair to say that someone had a fiduciary obligation to manage the funds appropriately.

Thus we reach the next issue, which is whether those fiduciary duties were breached. The alleged breach involves the deposit of the funds into a money market account, rather than into individually selected investments. For several reasons, we find no breach. First, it is uncontested that NHRC--through no fault of its own--did not have sufficient information to allow it to invest the funds into individual accounts until April 1997. Secondly, investing in a money market fund can hardly be characterized as irresponsible.

Finally, as the district judge said, "No harm; no foul." The employees suffered no damages. The

evidence in the record shows that during this time period the participants fared better in the money market funds than they would have in the individual investments they had previously chosen. If one measures the gains the assets made in the money market accounts and the gains they would have made had they been invested in November 1996 according to the employees' elections, one finds that the employees suffered no loss. The funds earned $23,886 in the money market accounts and would have lost $24,983 otherwise, a total benefit of $48,869. Furthermore, the investment was not a risky choice which could give rise to liability even in the absence of damages. Cf. Leigh v. Engle, 727 F.2d 113 (7th Cir. 1984).

The facts on which the calculations are made cause us to detour to the final issue the employees raise: should affidavits, including those on which the calculations are based, have been stricken from the record. The affidavits are those of Michael Sweeney and Michael Davis. Sweeney provides factual data regarding earnings, and based on that information, Davis provides the expert opinion that plaintiffs did not lose, but actually gained, from the deposit of the money in money market accounts.

The employees say the affidavits should be stricken for failure to comply with disclosure orders entered by the district court. They say that, in fact, the documents on which Sweeney relies were never produced or disclosed to the plaintiffs. Also, plaintiffs say no information about Davis was disclosed prior to the filing of the summary judgment motion. Therefore, the argument goes, NHRC should be precluded from using his affidavit. NHRC responds by saying that this is a last-ditch effort to avoid summary judgment and that the employees knew what NHRC's position was on damages and how it intended to prove it early on. Besides, NHRC says, even if all of the evidence were stricken, it would not matter because it is plaintiffs' burden to prove loss and they haven't done so.

Our only role on this issue is to determine whether the ruling was arbitrary and capricious. Cleveland v. Porca Co., 38 F.3d 289 (7th Cir. 1994). We find that it was not. Accordingly, the affidavits were properly before the court. The judgment of the district court is AFFIRMED.

/1 The original defendants were Tecumseh and NHRC. The appeal as to Tecumseh was dismissed on March 13, 2000.