In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3160

RALPH L. GRAYSON,

*Plaintiff-Appellant,*

*v.*

PAUL O'NEILL, Secretary, United States
Department of the Treasury,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 7907—**Elaine E. Bucklo**, *Judge.*

ARGUED APRIL 3, 2002—DECIDED OCTOBER 25, 2002

Before COFFEY, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* The United States Secret Service (referred to hereinafter as "Service") received in excess of 100 complaints (primarily concerning discrimination, solicitation of favors, and favoritism) about the Special Agent in Charge of the Chicago Field Office, Ralph Grayson. After it had received the complaints, the Service decided to conduct a management review of his office. The investigation revealed that Grayson not only intimidated and harassed his own employees, but also solicited favors from the public that he was charged to protect. After the

investigation, the Department asked for Grayson's resignation. After resigning, Grayson sued the Service, alleging that the Service initiated its investigation into his wrongdoing because of his race. The trial court granted summary judgment in favor of the Service and we affirm.

## I.  Factual Background

Ralph Grayson (African American) joined the United States Secret Service in 1974. From 1974 until 1993, Grayson was promoted through the ranks of the Secret Service, reaching the position of Special Agent in Charge (SAIC) of the Chicago Field Office. Grayson was the first African American appointed to be the SAIC of the Chicago Field Office, and one of only a handful of African American SAICs in the Service. As the SAIC of the Service's fifth largest field office, Grayson was in charge of 135 agents and Service employees. He was responsible for planning, directing and coordinating all law enforcement, protective, and administrative activities throughout the four-state area covered by the Chicago Field Office, including Illinois, Indiana, Iowa and Wisconsin. In his first evaluation as the SAIC of the Chicago Field Office in 1995, Grayson received an outstanding performance evaluation and a Senior Executive Service bonus award. Grayson continued to receive outstanding performance reviews throughout 1995 and 1996.

In January 1997, one of the two Assistant Special Agents in Charge (ASAIC) in the Chicago Field Office retired, thereby creating a vacancy. After reviewing a list of 15 agents eligible for the promotion based on their promotion scores, Grayson recommended that Isaiah Mapp, an African American male, be promoted to the vacant Chicago ASAIC position. Despite Grayson's recommendation, Richard Griffin, the Deputy Director of the Secret Service, informed Grayson that he preferred Tom Frost or William

Cotter, both white males, for the promotion. Ultimately Cotter was named to the position. Believing that the Service's decision to promote Cotter rather than Mapp was the product of race discrimination, Grayson informed his superiors of his concerns, though he never expressly mentions whom he contacted or the manner in which he relayed his concerns.[1]

In an unrelated event a few weeks after Cotter's promotion, Karen Whalen, a female Special Agent, complained that Grayson had sexually harassed her and given her "[i]nappropriate and inaccurate criticism in the presence of a non-supervisory employee." Bruce Bowen, the Service's Deputy Director of Investigations, spoke with Grayson via telephone regarding Whalen's complaint and, after completing his investigation, determined that relief was not warranted. But in early March, shortly after Whalen's initial complaint, she received a transfer to an undesirable detail in Gary, Indiana. On March 3, 1997, Whalen lodged a second complaint against Grayson, alleging that he had detailed her to an inconvenient office in retaliation for complaining about him. In response to Whalen's second complaint, Ralph Basham, the Service's Assistant Director of Administration and Grayson's immediate supervisor, authorized an investigation, also known as a "fact finding." Basham assigned Senior Special Agent Karen Barry, a female SAIC from Tennessee, and Norbert Vint, the Executive Assistant to the Secret Service Director for Workforce Diversity, to investigate Whalen's complaint. Because Vint was the Director of the Workforce Diversity Office, Eljay Bowron, the Director of the Secret Service at the time in question, directed him to describe the purpose and function of his office to the Chicago

---

[1] Grayson's beliefs appear to be unfounded, as Mapp shortly thereafter received a promotion to the SAIC of the Atlanta, Georgia Field Office.

agents by holding an open-office meeting during the time-frame for which he was in Chicago to investigate Whalen's complaint.

From March 24, 1997 to March 28, 1997, Barry and Vint conducted ten interviews during their fact-finding investigation into Whalen's complaint, including interviews of Whalen, her supervisors, her group leaders, and a peer. Barry and Vint also held an open meeting with the agents where Vint presented information regarding his office. After their investigation, Barry and Vint determined that Agent Whalen's second complaint should be dismissed. In the process of investigating Whalen's complaint, Barry and Vint uncovered a shocking pattern of improper behavior on the part of Grayson. In the few short days that Barry and Vint conducted their investigation, more than ten agents *independently* approached them desiring to voice complaints about Grayson. The complaints were less than innocuous and included allegations that: 1) Grayson received numerous gratuities and other favors for his personal use from private organizations; 2) Grayson retaliated against employees for speaking out against him or his policies; 3) Grayson sexually harassed and discriminated against female employees; 4) Grayson treated African American employees more favorably than other employees; and 5) the Chicago Field Office had low employee morale.

Barry and Vint reported the allegations to Bowen, who instructed the Office of Inspection to conduct a Management Review of the Chicago Field Office. Upon Bowen's request, a Management Review team, comprised of 16 inspectors conducted a two-month long investigation of the Chicago Field Office commencing on April 3, 1997. During the management review, the inspectors received over 100 complaints about Grayson that corroborated the complaints uncovered by Barry and Vint. The inspectors received complaints from such diverse sources as: 1) employ-

ees in the Chicago Field Office, 2) the Chicago Police Department, 3) Chicago area businesses, and 4) former subordinates during Grayson's tenure in other Service offices.

The extent of Grayson's improprieties cannot be fully appreciated without a sampling of his numerous condemnable behaviors. Beginning with the least troubling allegations, the investigative team discovered that morale in the Chicago Field Office was abominably low. Out of 82 Service employees, 36 described their morale as low to non-existent, including but not limited to fourteen of the eighteen women in the office. The employees ascribed a constellation of reasons for the morale failure within the office, complaining that: 1) Grayson cared more about the office's arrest statistics than the working conditions; 2) Grayson did not effectively plan assignment and squad rotations; 3) Grayson favored African American agents and gave them preferable training courses and assignments; and 4) Grayson refused to accept managerial input and suggestions from his supervisory agents.

But Grayson did more than depress the morale of his employees. In addition, many employees believed that Grayson actively intimidated and harassed employees as well as retaliated against those who complained about his heavy-handed managerial style. For example, Special Agent John Orloff complained that when he sought to discuss his annual review with Grayson, the ASAIC informed him that: "[t]his is a quote from the boss [Grayson], 'tell Orloff I think he's doing an outstanding job, but if he chooses to come in and discuss his evaluation with me his points may go down.'" Similarly, Special Agent Peter Paradis stated that Grayson attempted to influence his testimony regarding Agent Whalen's discrimination claim by telling him that he knew who "butters his bread." More than a dozen other agents shared similar complaints, expressing the belief that Grayson intimidated his employees and created a culture in which the agents feared reprisals should they cross him.

Grayson's more appalling behavior concerned his negative attitude towards women and wanton and unchecked sexual harassment of female employees. Special Agent Mary Drury was a repeated target of Grayson's unwelcome sexual advances. He told her that her "legs seem to be just fine," commented on her clothing, and told her that "she should look around at the women who have been on this job for a long time . . . [because] they didn't look so good . . . [but that] maybe she was the exception to the rule." Numerous employees complained that Grayson repeatedly ogled and fondled female agents and other employees. His vulgar remarks to female agents include referring to himself as "big dick daddy from Cincinnati," commenting to female agents that if they had not had sexual intercourse with a black man that they were racists and bigots, and advising them that if they tried "a black man sexually . . . [they] would never want to be with anyone else." The investigation even revealed that Grayson had harassed an Assistant United States Attorney by repeatedly telephoning her at home to request dates.

The most serious allegations were that Grayson improperly, if not illegally, required his agents to solicit free services for his personal use from area businesses. Several area business and security personnel (including the director of operations for the United Center, the director of security for Harpo Studios, and the director of security for the Sheraton Hotels) commented upon Grayson's reputation in the community as an official who was always looking for something for free. Indeed, not only did Grayson solicit improper personal favors, but also required that his agents collect the perks squeezed from the local businesses. As with all of his other disturbing behaviors, Grayson offers no excuses or apologies for his seeking of personal favors from the public he protected—instead characterizing his solicitations as "small perks" and "insignificant."

Following the managerial review, Grayson not surprisingly received an "unsatisfactory" rating during his annual performance review for the July 1996-June 1997 review cycle. Moreover, because many of the complainants voiced a fear of retaliation, the Service also detailed Grayson to Washington, D.C., in August 1997, concluding that Grayson could not continue to manage the Chicago Field Office effectively and that he might retaliate against those who voiced complaints about him. While detailed to Washington, the Service provided Grayson with an office and a government car, as well as allowed for travel to Chicago to see his family. At all times, Grayson maintained his same rank, grade and salary as he had as the SAIC in Chicago. After it transferred him, the Service informed Grayson that he would be disciplined, but offered him the opportunity to retire before any discipline was taken. Grayson chose the retirement route and he left the Service as of March 28, 1998.

Grayson alleged that the Service's actions were the product of race discrimination and filed multiple complaints with the Equal Employment Opportunity Commission (EEOC). In Grayson's first complaint, filed with the EEOC on June 3, 1997, he stated that the investigation triggered by Agent Whalen's complaints was in retaliation for Grayson's support of Isaiah Mapp, an African American male, rather than Tom Frost or William Cotter, white males, for promotion to a vacant ASAIC position. The EEOC denied this claim on June 27, 1997, and he appealed. The EEOC denied his appeal on August 28, 1998 and issued Grayson a right-to-sue letter, which his counsel received on August 31, 1998 and which Grayson himself received on September 8, 1998.

Grayson filed additional discrimination claims on December 3, 1997 and March 31, 1998, alleging that his detail to Washington, D.C., his unsatisfactory perform-

ance review, and the Service's request that he retire were due to race discrimination and retaliation for his June 3 claim. The EEOC denied these claims as well and issued a second right-to-sue letter on November 2, 1998.

On December 9, 1998, Grayson filed a complaint of employment discrimination and retaliation in the Northern District of Illinois. Grayson alleged that the Service discriminated and retaliated against him when it investigated him, removed him from the Chicago office and assigned him to the Washington, D.C. office, gave him a poor performance review, and constructively discharged him by forcefully suggesting that he accept early retirement or face disciplinary proceedings. According to Grayson, a climate of racism permeated the Service and targeted minorities, including himself. Grayson further claimed that the Service's actions were in retaliation for his unsuccessful support of Mapp for promotion to the ASAIC position in Chicago.

In August 1999, the trial court granted partial summary judgment in favor of the Service. Grayson's attorney had received the right-to-sue letter on August 31, 1998, and Grayson had not filed suit until December 9, 1998, 101 days later—eleven days after the 90-day period for filing such claims had passed. *See* 42 U.S.C. § 2000e-5(f)(1). The trial court thus dismissed as time-barred Grayson's claims raised in his June 1997 EEOC complaint, including his claims that: 1) he was retaliated against in response to his support for Mapp; 2) he was retaliated against in response to his complaints of discrimination; and 3) he was retaliated against when the Service conducted the management review of Agent Whalen's complaints.

Discovery proceeded on Grayson's remaining claims and was extended a total of four times—three times at Grayson's request and once at the Service's request. In September 2000, the Service moved for summary judg-

ment on Grayson's remaining claims, arguing that he had not established a prima facie case of discrimination and, even if he had, he could not demonstrate that the Service's reasons for its actions were pretextual. Grayson filed a Rule 56(f) motion to strike the motion for summary judgment or alternatively to allow him to reopen discovery to uncover new evidence. According to Grayson, a "sinister, clandestine climate of racism" existed within the Secret Service. Grayson's theory was based on evidence of a 1990-1992 "Good Ol' Boy Round-up," involving unknown law enforcement participants in racist conduct in the southern United States. Grayson alleged that Service personnel who participated in the "roundups" were not disciplined, thus establishing that the Service gave more lenient treatment of similarly situated white employees. The trial court refused to allow Grayson to reopen discovery because the alleged evidence sought by Grayson was not new and had been available to him throughout the discovery period. The trial court later issued a thorough opinion granting summary judgment in favor of the Service on Grayson's race discrimination claim. In that opinion, the trial court proceeded directly to the pretext analysis and ruled that Grayson had failed to establish that the Service's reasons for its employment actions—mainly the overwhelming documentation that Grayson destroyed the morale of his subordinates through intimidation and harassment as well as improperly solicited personal favors throughout his tenure as the SAIC of the Chicago Field Office—were pretextual.

## II. Issues

Grayson raises three issues on appeal. Initially, Grayson argues that the trial judge committed error in denying his Rule 56(f) motion. Second, Grayson contends that the trial judge erred in dismissing all of his retaliation claims

as time-barred. Finally, Grayson contends that the trial judge erred in granting summary judgment in favor of the Service on his discrimination and constructive discharge claims.

## III. Analysis

A.  *Grayson's Rule 56(f) Motion*

Initially, Grayson complains on appeal that the trial judge committed error when she refused to allow him to re-depose his supervisors regarding any involvement they allegedly had with the "Good Ol' Boy Round-up."[2] Summary judgment should not be entered "until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). Accordingly, Federal Rule of Civil Procedure 56(f) provides that where a "party opposing the [summary judgment] motion cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may . . . order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had . . . ." Fed R. Civ. P. 56(f).

A trial judge's decision to consider a defendant's motion for summary judgment before allowing the plaintiff to

---

[2]  According to a March 1996 Department of Justice Report by the Office of the Inspector General entitled "Allegation of Racial and Criminal Misconduct at the Good Ol' Boy Roundup," some of the Roundup events involved highly racist conduct. Racist activities documented by the Report included "checking cars" of those entering the event to prevent African-Americans from attending, posting signs with racist messages including "no niggers" and "nigger checkpoint," and performing racist skits, including one in 1990 involving a "slave" in blackface performing oral sex on a "Klansman."

depose certain witnesses is a discovery matter, which we review under the abuse of discretion standard. *Woods v. City of Chicago*, 234 F.3d 979, 990 (7th Cir. 2001); *Pfeil v. Rogers*, 757 F.2d 850, 856 (7th Cir. 1985). Under Rule 56(f), a party must file an affidavit stating the reasons why he cannot respond to a summary judgment movant's affidavits. *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 n.5 (7th Cir. 2000).

Grayson desired to re-open discovery, after it had been extended four times, in order that he might re-depose certain Service personnel regarding the "Good Ol' Boys Roundup." Grayson speculated that he might uncover evidence that other SAICs participated in the Roundups, but were not disciplined by the Service and thus that the Service discriminated against him by disciplining him for his improper conduct. Grayson's argument is without merit for two reasons.

First, as the trial court commented, evidence of the Roundups certainly was not "new knowledge" warranting the re-opening of discovery and Grayson offered no explanation for his failure to uncover the evidence of the Roundup until September 2000, long after discovery had concluded and when the defendant had a summary judgment motion pending before the trial court. Indeed the evidence in the record before us demonstrates that the Roundups were common knowledge long before Grayson brought this suit. In Grayson's brief to this court, he claims that the Roundups "unleashed a firestorm" on national television in 1995. Further, in 1996, the Office of the Inspector General released an extensive public report detailing the allegations regarding the Roundups. Grayson contends that his lack of diligence should be excused because the Service "concealed its knowledge of the Roundups" by failing to disclose a class action lawsuit containing allegations that the Service engaged in a pattern of discriminatory practices, including retaliation against African

American agents that spoke out against discrimination. *See Moore v. Summers*, 113 F. Supp. 2d 5, 11 (D.D.C. 2000). In that suit, several African American agents from the <u>Atlanta</u> office alleged that Service personnel had participated in the Roundups. But the Service had no obligation to disclose the *Moore* suit because Grayson never requested such information—his interrogatory specifically requested only that the Service identify "all charges of racial employment discrimination filed against the Secret Service with any federal, state or local agency *concerning conduct of individuals in the districts overseen by the Chicago Field office since 1993*." (emphasis added). Where a party's own lack of diligence is to blame for that party's failure to secure discoverable information, it is not an abuse of discretion to deny a Rule 56(f) motion. *Id.*; *Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir. 1996). In this case, Grayson had more than ample opportunity to discover and present evidence of the Roundups and the trial judge was well within her discretion to limit and refuse to prolong discovery for a fifth time so that Grayson could gather more evidence.

Grayson's Rule 56(f) motion was flawed for another reason: the evidence he sought is not relevant to his case. While evidence that Service personnel participated in the Roundups certainly could be characterized as an unsightly blemish upon the Service's reputation, it is not germane to the question of whether the Service launched a discriminatorily motivated investigation into Grayson's management of the Chicago Field Office. Evidence of generalized racism directed at others is not relevant unless it has some relationship with the employment decision in question. *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997). Grayson points to no evidence to suggest that any of the decision-makers in this case somehow participated in or condoned the Roundups, and thus cannot establish that evidence of the Roundups has any connection to his discrimination claims in this case.

Federal trial judges are called upon to manage notoriously crowded dockets. "Necessarily, they must have substantial discretion as they manage their dockets." *Reales v. Consolidated Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996). Without any evidentiary support, his request amounts to nothing more than a fishing expedition and we decline to rule that the trial judge abused her discretion in denying Grayson the opportunity to extend discovery a fifth time.

## B.  Grayson's Retaliation Claim

Grayson next argues that the trial judge erred in ruling that his retaliation claim was time-barred. The trial judge correctly observed that Grayson's attorney received the right-to-sue letter on these claims on August 31, 1998, and that Grayson failed to file his complaint until December 9, 1998, a period in excess of the statutorily proscribed 90-day filing period. 42 U.S.C. § 2000e-5(f)(1); *Threadgill v. Moore U.S.A., Inc.*, 269 F.3d 848, 849, 850 (7th Cir. 2001) (90-day statute of limitations begins to run on the date claimant or attorney representing him received the letter). Accordingly, the trial judge's dismissal of Grayson's retaliation claim was proper.

Grayson seeks to breathe life into this claim by arguing for the first time on appeal that the Service retaliated against him not only because he protested the allegedly discriminatory treatment of Mapp, but also because he filed a discrimination claim with the EEOC on June 3, 1997. But this retaliation claim appears nowhere in Grayson's complaint: Count I of his complaint alleges that the Service retaliated against him after he opposed "unlawful discrimination against Mapp and file[d] a charge with the EEOC on April 2, 1997." It is well-established that a party waives the right to argue an issue on appeal if he fails to raise that issue before the trial court. *Moulton v.*

*Vigo County*, 150 F.3d 801, 803 (7th Cir. 1998); *Stevens v. Umsted*, 131 F.3d 697, 705 (7th Cir. 1997) ("It is axiomatic that arguments not raised below are waived on appeal."). Although it is true that Grayson argued in opposition to summary judgment that the Service retaliated against him for filing EEOC complaints, "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996). Because Grayson failed to present to the trial judge any claim that the Service retaliated against him because of his June 3, 1997 EEOC complaint, we shall not consider the merits of that claim on appeal.

## C.  Grayson's Discrimination Claim

Finally, Grayson argues that the trial judge committed error by granting the Service summary judgment on his discrimination and constructive discharge claims. Grayson offered no direct evidence that the Service discriminated against him because of his race and so proceeded under the familiar burden-shifting test set forth initially in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this test, Grayson was required to carry the burden of establishing a prima facie case of discrimination and demonstrate that: 1) he was a member of a protected class; 2) he was meeting his employer's legitimate expectations; 3) he suffered an adverse employment action; and 4) other, similarly situated employees who were not members of the protected class were treated more favorably. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). After Grayson establishes a prima facie case of racial discrimination, the burden of production shifts to the Service to demonstrate a legitimate, non-discriminatory reason for its employment action. *Id.* Once the Service has proffered a legitimate non-discriminatory

reason for its employment action, the burden returns to Grayson to demonstrate that the Service's proffered reason was pretextual. *Id.* In order to establish pretext a plaintiff must demonstrate that an employer's proffered explanation for an employment decision is a dishonest explanation, rather than merely an error. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000).

We have frequently warned litigants that the prima facie case must be established and not merely incanted. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002); *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). Given this admonition, it is interesting to note that nowhere in his brief does Grayson dispute the Service's claim that well over 100 agents in the Chicago Field Office lodged complaints with the management review team about Grayson's heavy-handed, morale-reducing, managerial style. Likewise, Grayson fails to dispute the Service's claim that it received numerous complaints about Grayson's solicitation of personal favors from those whom he was charged with the duty to protect. Given the magnitude and severity of the complaints, Grayson has failed to establish that he was meeting his employer's legitimate expectations. Although Grayson attempts to argue that his prior record demonstrates that he was meeting the Service's legitimate expectations, the issue is simply whether he was meeting the Service's expectations at the time of the discharge. *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002). Grayson also protests that the Service overreacted to the numerous complaints regarding his behavior. But a public official who solicits bribes and sexually harasses his subordinates cannot, by any stretch of the imagination, be considered to be meeting his employer's legitimate expectations.

We disagree with Grayson's contention that he can establish a prima facie case of race discrimination because the Service applied its employment expectations against him in a discriminatory manner. According to Grayson's theory, three white SAICs who had similar sexual harassment complaints lodged against them by a female subordinate were not subjected to an investigation into matters beyond the sexual harassment complaint. Thus, Grayson believes he was singled out for a racially discriminatory investigation and argues that the employee complaints and other evidence uncovered by the management review team are the fruits of a poisonous tree and cannot be used as the basis for an adverse employment action. When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably. *See, e.g.*, *Peele v. Country Mutual Ins. Co.*, 288 F.3d 319, 329-30 (7th Cir. 2002); *Curry v. Menard*, 270 F.3d 473, 478 (7th Cir. 2001); *Johnson v. West*, 218 F.3d 723, 733 (7th Cir. 2000); *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999).

To meet his burden of demonstrating that another employee is "similarly situated," a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *Greer v. Board of Educ.*, 267 F.3d 723, 726 (7th Cir. 2001); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). In this inquiry, a "court must look at all relevant factors, the number of which depends on the context of the case." *Radue*, 219 F.3d at 617.

In his attempt to find other SAICs who were similarly situated, Grayson argues that three white male SAICs were

accused of sexual harassment or depressing morale. According to Grayson, none of the three white SAICs was the subject of an extensive management review, which he believes demonstrates the Service treated him differently because of his race. Grayson's theory hinges upon his belief that if the Service had only investigated Special Agent Whalen's complaint via telephone, rather than by sending two fact-finders and conducting an open meeting in the Chicago Field Office, that none of his nefarious and inappropriate actions would have surfaced. Grayson's speculation is completely without merit. When the fact-finders came to Chicago, they were approached *independently* by several agents who sought to voice complaints about Grayson. No other SAIC, regardless of race, had been the subject of so many embarrassing and offensive complaints as Grayson, and Grayson identifies absolutely no evidence in the record to suggest that it was the way in which the fact finding was conducted, as opposed to his own shameful conduct, that generated so many complaints.

In a last-ditch effort to preserve his appeal, Grayson reaches out to find a similarly situated employee by again raising the specter of the "Good Ol' Boy Round-up" as evidence that the Service condoned racism and singled out African American SAICs for discriminatory treatment. Grayson theorizes that an Assistant SAIC in another office may have at some time participated in the Roundups and that Director Bowron, who was the SAIC in Atlanta at the time when the Roundups were in their heyday, should have investigated and disciplined this unnamed Assistant SAIC. Grayson's speculation has no evidentiary support. Contrary to Grayson's claim that agents who participated in the Roundups were never disciplined or investigated, the record demonstrates that participation by Service agents in the Roundups was thoroughly investigated by the Department of Justice and Department of Treasury Inspector General's Office and Congress. Gray-

son presented not a shred of evidence to suggest that Director Bowron left any ASAIC who allegedly participated in the Roundups undisciplined.

Grayson has failed to point out any other SAIC who was the subject of more than 100 complaints ranging from depressing morale to sexual harassment to soliciting personal favors, and thus his attempt to locate a similarly situated employee is futile. Because pointing to a similarly situated employee who was treated more favorably is an essential element of his prima facie case, Grayson's discrimination and constructive discharge claims must fail.

Even if Grayson could establish a prima facie case, he could not raise a genuine issue of material fact as to whether his transfer and detail (and eventually the request for resignation) were pretextual. "A pretext for discrimination means more than an unusual act; it means something worse than a business error; pretext means deceit used to cover one's tracks." *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001) (internal quotations omitted). To demonstrate pretext, Grayson must demonstrate that the Service's articulated reason for its actions either: 1) had no basis in fact; 2) did not actually motivate its decision; or 3) was insufficient to motivate its decision. *Velasco v. Illinois Dept. of Human Serv.*, 246 F.3d 1010, 1017 (7th Cir. 2001).

Grayson engages in mental gymnastics in an attempt to convince us that the Service did not honestly believe, based on the results of the investigation, that he was not suited to manage the Chicago Field Office. For instance, he quibbles that the Service's assessment of his office's morale was erroneous because only 36 of 82 employees complained of low morale, meaning that 56 did not. He also suggests that several agents stated that they were not intimidated by him, and thus the Service's assess-

ment was erroneous. Lastly, Grayson characterizes his solicitation of personal favors as a "petty reason." But in determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers. *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). As we often comment, "the federal anti-discrimination laws do not authorize judges to sit as a kind of 'super-personnel department' weighing the prudence of employment decisions," and Grayson's self-serving quarrels with the legitimacy of the Service's investigation cannot establish pretext. *Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997). Grayson fails to direct us to anywhere in the record to suggest that the Service did not honestly believe, based on more than 100 complaints from employees, former employees, and citizens of the community Grayson protected, that Grayson engaged in behavior that warranted removing him from his position as the SAIC of the Chicago Field Office.

## IV. Conclusion

Grayson engaged in a pattern of behavior that was inappropriate, not to mention deplorable, for a Special Agent in charge of a large field office. Well over 100 complaints were lodged against him detailing his behavior, for which he offers no excuses. In this appeal, Grayson again shamelessly refuses to accept responsibility for his own misguided activity and instead points the finger at those who investigated him. As he has failed to present sufficient evidence to demonstrate that he was meeting his employer's legitimate expectations, we AFFIRM the decision of the trial court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*