**Anthony M. NWANNA, Plaintiff–Appellant,**

v.

**John D. ASHCROFT, Attorney General of the United States, Defendant–Appellee.**

No. 02–2405.

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 16, 2002.*

Decided Jan. 28, 2003.

Before FAIRCHILD, EVANS, and WILLIAMS, Circuit Judges.

ORDER

Anthony M. Nwanna, an African–American of Nigerian descent, sued the United States Attorney General under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

**10**

§ 2000e *et seq.*, claiming that he was unlawfully fired from his job as a physician's assistant ("PA") with the Bureau of Prisons ("BOP") at the United States Penitentiary ("USP") in Terre Haute, Indiana. Nwanna alleged that he was subjected to unequal terms and conditions of employment on account of his race and national origin and ultimately terminated because of his race and his testimony in a fellow Nigerian employee's pending Equal Employment Opportunity ("EEO") investigation. The district court granted the defendant's motion for summary judgment. Nwanna appeals, and we affirm in part and vacate and remand in part.

We set out the summary judgment evidence in the light most favorable to Nwanna. Nwanna began working as a PA at USP Terre Haute in early May 1995. He was terminated the following May before his probationary year ended. Warden Jeffrey Clark, who made the final decisions to both hire and fire Nwanna, explained that he fired him after discovering that Nwanna had lied about a defaulted student loan when asked about outstanding financial obligations on several different employment documents. Nwanna attributed his termination to retaliation for his EEO testimony and a concerted effort to eliminate African–American physicians and PAs from the prison's Health Services Department.

During the year Nwanna worked at USP Terre Haute, there were two other African–American PAs of Nigerian descent in the Health Services Department: Marcel Ihenacho, who was hired around the same time as Nwanna but fired in February 1996, and Charleston Iwuagwu, who recruited Nwanna to USP Terre Haute but later transferred to another institution after filing his own discrimination claim against the prison. Additionally, there was an African–American Clinical Director, but he resigned before Nwanna

was fired. Nwanna and Iwuagwu speculated that he did so under pressure after he sided with the Nigerians in the ongoing race difficulties there.

Nwanna contends that while at USP Terre Haute he and the other Nigerian PAs were treated less favorably than white co-workers. Specifically, in February 1996 Nwanna asked to attend an emergency medicine symposium in San Diego, California, as part of his continuing education. Nwanna was turned down on the recommendation of Health Services Administrator Chris Rollins, who ostensibly felt that the training was for physicians and not PAs. However, the registration form listed a symposium fee for PAs. And Iwuagwu averred that his own multiple requests for continuing education were likewise denied. Nwanna also had difficulty getting overtime shifts and getting paid when he did work overtime. Unlike other employees, Nwanna and Iwuagwu were required to write memos justifying their entitlement to overtime pay.

In early March 1996 Nwanna received a performance appraisal from his supervisor that was negative and did not mention Nwanna's good attributes, including volunteering several ideas that had improved the department. Later that same month a white nurse ordered Nwanna to attend to an inmate, humiliating him in front of inmates and other staff. After Nwanna complained to the administration about the incident, the supervisor who wrote his appraisal summoned Nwanna and berated him for not first coming to the supervisor about the problem. The supervisor also sided with the nurse, allegedly because they were romantically involved. The supervisor later made a negative entry in Nwanna's assessment log after another argument between Nwanna and the nurse.

In February 1996, Ihenacho was fired for failing to respond to emergencies.

Sometime between February and April, Nwanna testified in Ihenacho's pending EEO matter despite his fear of reprisal. Nwanna detailed his view of the discriminatory practices at USP Terre Haute and speculated that Ihenacho's termination may have been motivated by race and national origin. Then on the afternoon of April 10, 1996, Nwanna received for review a transcript of his testimony in Ihenacho's EEO action. That same afternoon he returned the transcript with changes to the personnel office, and was called back there within an hour. At that time Health Services Administrator Rollins and the Human Resources Manager gave Nwanna a letter proposing his termination. The termination proposal had been faxed early that morning from the prison's human resources office to the regional human resources office and the Labor–Management Relations office in Washington, D.C., for review.

The proposal cited Nwanna's failure to disclose defaulted student loans when he applied to the BOP as the basis for firing him. When he applied for the PA position in 1995, Nwanna filled out several forms and participated in a pre-employment interview where he was asked about any delinquent financial obligations, including federally-guaranteed loans, and warned that failing to respond truthfully would constitute grounds to refuse to hire or later fire him. Nwanna represented that he was not in default or delinquent on any federal loans. In fact, at the time he was hired Nwanna had failed to make any payments on at least $10,000 in outstanding Guaranteed Student Loans backed by the Higher Education Assistance Foundation. He had graduated from medical school in 1990, and by his own calculation should have started paying off the loans 18 months later. Nwanna claims that he still had not made any payments five years later when he filled out his BOP materials

because the loans had erroneously been declared in default in 1984. Nwanna had transferred schools in 1983, and the loans were shown as defaulted instead of, as should have been the case, deferred until his graduation in 1990. By that time what should have been a $10,000 debt (two $5,000 loans) had grown significantly.

Although Nwanna had discovered the default classification by 1988 and tried to contest it, he says he never made a payment before being hired by the BOP because he was told doing so would be tantamount to admitting liability for the augmented amount. Nwanna therefore did not disclose the loans when he applied because he believed they were not really in default, as he was contesting the original classification.

When he first reported to work after training in Glenco, Georgia, Nwanna was questioned about his loan responses. Beverly Macklin, a Human Resource Security Specialist at the prison, again contacted Nwanna about the loans in October 1995. Then in November Nwanna began making $50 payments towards the loans and providing proof of that payment to prison administrators. Nwanna received several other communications about the loan from prison administrators, and Macklin prepared memos dated April 5 and 25, 1996, noting that she had spoken about Nwanna with the manager of the loan collection agency, who confirmed that Nwanna had made no payments before November 1995. Warden Clark gave Nwanna several opportunities after the April 10 termination proposal to explain why he never disclosed the defaulted loans on his application forms, but ultimately informed Nwanna on May 3, 1996 that he was being fired.

Nwanna contacted an EEO counselor on May 6, 1996. After he received a right-to-sue letter, Nwanna timely filed this suit.

Although originally represented by counsel, Nwanna's counsel withdrew in September 2001, and the district court later granted summary judgment to the BOP.

We review a grant of summary judgment de novo. *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 752 (7th Cir.2002). We construe all facts in the light most favorable to Nwanna and draw all reasonable and justifiable inferences in his favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), but to withstand summary judgment he still must have provided evidence demonstrating a genuine issue of material fact for trial. *Patt*, 280 F.3d at 752.

On appeal Nwanna contends that he presented sufficient evidence of retaliation and discrimination to create a triable issue of material fact. Nwanna also argues in his reply brief that the district court improperly granted the BOP's motion for summary judgment sua sponte, without giving him notice and an opportunity to present his evidence. *See Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 740 (7th Cir. 2002). This latter argument is refuted by the record, and, further, Nwanna waived it by failing to raise it in his opening brief. *See id.* at 741.

Lacking any direct evidence of retaliation or discrimination, Nwanna proceeded under the familiar burden-shifting approach laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, Nwanna must first have established a prima facie case by a preponderance of the evidence. *Id.* at 802. If he did, he created a rebuttable presumption of discrimination (or retaliation) that shifted to the BOP the burden of producing evidence of a legitimate, nondiscriminatory (or retaliatory) reason for its actions. *Id.* Nwanna must then have demonstrated by a preponderance of the evidence that the BOP's reasons were actually pretextual.

*Id.* at 802–03. On all three of his claims—disparate treatment, retaliatory discharge, and discharge on account of race and national origin–the district court concluded that Nwanna had failed to establish a prima facie case. With respect to his discharge, the district court further held that, even if it were assumed that he did establish a prima facie case, Nwanna had nonetheless failed to show that the BOP's reason for terminating him was pretextual.

■ We agree with the district court that Nwanna failed to establish a prima facie case of disparate treatment based on his working conditions at USP Terre Haute. It is enough here to observe that none of the actions Nwanna complained of constituted an adverse employment action, an element of his prima facie case. *Grayson v. O'Neill*, 308 F.3d 808, 817–18 (7th Cir.2002). Although we have defined "adverse employment action" broadly, the challenged action must result in some significant change in employment status. *Bell v. EPA*, 232 F.3d 546, 555 (7th Cir. 2000). We will consider both qualitative and quantitative changes in terms or conditions of employment. *Patt*, 280 F.3d at 753. By Nwanna's own admission, he received pay for all overtime except thirty minutes for which he elected not to submit a request. All that is left is the denial of one request for continuing education, a directive voiced by a nurse in front of inmates and staff, and evaluations that were subjective and did not mention Nwanna's contributions. We fail to see how these events worked a significant change in Nwanna's employment status. Not everything that makes an employee unhappy, as these actions undoubtedly did, constitutes actionable adverse employment action under Title VII. *See, e.g., Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691 (7th Cir.2001).

■ However, on his retaliation and discrimination claims (based on his termi-

nation), we conclude that material issues of disputed fact exist that should have precluded the entry of summary judgment. The only elements of the prima facie cases in dispute–common to both a retaliation and a discrimination claim–are whether Nwanna demonstrated that he (1) was meeting the BOP's legitimate job expectations and (2) was treated less favorably than a similarly situated employee who either did not engage in statutorily protected activity (retaliation) or was not a member of a protected class (discrimination). *See Hilt–Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir.2002) (prima facie case for retaliation); *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir.2002) (same); *Peters v. Renaissance Hotel Operating Co.,* 307 F.3d 535, 545 (7th Cir.2002) (prima facie case for unlawful discrimination); *Mateu–Anderegg v. Sch. Dist. of Whitefish Bay,* 304 F.3d 618, 625 (7th Cir.2002) (same).

At the outset, we disagree with the BOP and the district court that Nwanna could not proceed past the prima facie stage on his discharge claims because he never identified a similarly situated employee. The district court reasoned that Nwanna provided no evidence that "any other employee who had failed to respond completely and truthfully about outstanding student loans on his job application ... was treated differently." But the record does contain four letters written by either Warden Clark or Macklin requesting waivers to retain employees who lied during their background investigations. Specifically, the letters deal with a black male who did not reveal disciplinary action taken against him while he worked at a state prison, a black male who similarly withheld information about two letters of reprimand received while working at a state prison, a white male who did not reveal an investigation into his conduct while he served in the United States Marine Corps, and a white female who did not reveal that she had received a written reprimand at a previous job. The letters seeking to retain other employees despite employment-application omissions sufficiently identify employees comparable in circumstances relevant to this case, *see Grayson,* 308 F.3d at 819 (factors relevant to similarly situated employee inquiry depend on context of the case); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998) (same); we think requiring Nwanna to find a coworker whose omission dealt specifically with indebtedness asks too much at the prima facie stage. *Cf. Goodwin v. Gen. Motors Corp.,* 275 F.3d 1005, 1012 (10th Cir.2002) (burden for prima facie case is not "onerous").

The district court also concluded with respect to Nwanna's discriminatory discharge claim (and by implication his retaliatory discharge claim, as both require such a showing) that he failed to demonstrate that he met the BOP's legitimate employment expectations. The district court determined that, regardless of Nwanna's professed belief that he was actually not in default, he did not truthfully answer the questions about delinquent debts, and an employer may legitimately expect truthful responses. But this conclusion is inseparable from whether Nwanna's responses about the loans were the real reason he was fired, and thus we analyze the legitimate employment expectations element of the prima facie case and the issue of pretext simultaneously. *See Jones,* 302 F.3d at 742 (legitimate expectations prong of prima facie case often merges with related issue of pretext); *Roberts v. Separators, Inc.,* 172 F.3d 448, 451 (7th Cir.1999) (analysis of employer's legitimate expectations often "dovetails" with that of pretext).

Nwanna may establish pretext by producing evidence demonstrating that Warden Clark's reason was factually baseless, did not truly motivate his decision, or was

insufficient to warrant Nwanna's termination. *Grayson*, 308 F.3d at 820. Nwanna points to evidence from which a factfinder could reasonably conclude that before he was fired he had already satisfied the BOP about his answers concerning the unpaid loans, and that his responses were therefore not the real reason he was fired.

First, Nwanna testified in his deposition that Macklin assured him that he could favorably resolve any issue over his answers on the employment forms by providing proof of consecutive $50 payments. Second, Nwanna points to two memos written to him regarding proof of payment. Macklin wrote Nwanna on January 19, 1996, reminding him to bring in cancelled checks (as opposed to the carbon copies he had already provided) as proof of payment from November 1995 through April of 1996. Then on March 13 Associate Warden DeWalt wrote Nwanna giving him five days to "bring in the documents you have been asked to produce." The memo referred to February and March 1996 payments "of the agreed upon amount of $50.00." Nwanna asserts that these documents corroborate his deposition testimony that the BOP had accepted his explanation for why he gave the answers he did on the employment forms, and was really interested only in whether he was then repaying what he owed. The BOP counters, not with an argument that Nwanna's position is unreasonable, but with the unhelpful contention that given "the long history of contacts, both before and after April 10, 1996, Nwanna did not establish that the stated reason was pretext."

We think it obvious that the "long history of contacts," when viewed in the light most favorable to Nwanna, support the very inference he urges–that his responses on employment forms were not the real reason for his termination. The BOP contends that the ongoing process is proof that the administration sought to determine whether or not Nwanna lied on his application forms, and that when Warden Clark concluded that he did, he fired him on that basis. But the memos to Nwanna reveal the administration's focus on Nwanna's *current* loan payments, not his responses on his application; the BOP does not tell us what Nwanna's payment history after he was on the job could possibly have to do with whether he honestly answered the questions on the forms he completed to *get* the job. And neither Macklin's calls to the collection agency in April 1996 nor Warden Clark's meetings with Nwanna after he received the letter proposing his termination disprove Nwanna's contention that the student loan issue was "revisited" once the administration was looking for a reason to fire him.

Further, Warden Clark and Health Services Administrator Rollins both testified that Nwanna was a good employee whom they wished could have stayed. Another supervisor similarly testified that Nwanna's "job performance was exceedingly good." Although Warden Clark testified that he "hired [Nwanna] and ... wish[ed][he] could have retained him," he did not request a waiver on Nwanna's behalf. Such contradictions suggest the possibility that after Ihenacho's termination in February the focus shifted from working with a desirable employee to finding an expedient way to fire him. A factfinder could infer from the evidence that the student loans were not the real reason for Nwanna's termination. Thus, a jury must consider the ultimate question of whether the BOP unlawfully retaliated and discriminated against Nwanna. *See, e.g., Perdomo v. Browner*, 67 F.3d 140, 145–46 (7th Cir.1995).

We are not persuaded otherwise by the BOP's additional contentions. The BOP argues that Nwanna never countered its evidence that Warden Clark and others involved in the decision to fire him did not

even know that he had testified in Ihenacho's EEO investigation. In particular, the BOP cites Warden Clark's testimony that he didn't "have any knowledge of [Nwanna] testifying in a prior EEO case," and evidence that the termination proposal had already been faxed to Washington for review before Nwanna returned his corrected EEO testimony to the personnel office. But to avert summary judgment, Nwanna was not required to prove conclusively that someone involved in the decision to fire him knew about his testimony; at the summary judgment stage he needed only produce enough evidence to support an inference of such knowledge. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 755 (7th Cir.2000); *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 941 (7th Cir.1999). Nwanna did so. His evidence suggested that Health Services Administrator Rollins coordinated PAs' work schedules, which explains Nwanna's assertion that it was Rollins who approved time off for him to testify during the EEO investigation. And, of course, Rollins' signature on the termination proposal and his presence when it was given to Nwanna implies his input into the decision. Thus, the BOP's insistence only that *Warden Clark* did not know is unhelpful without further evidence that he was the *sole* (as opposed to final) decisionmaker, a contention absent from the BOP's summary judgment materials. Further, it is reasonable to infer that what Rollins knew he also told Warden Clark, and so the warden's denial is contested material evidence that a jury must resolve. *See Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 980 (7th Cir. 2000) (personnel manager's testimony that she fired plaintiff without knowing about plaintiff's protected activity was sufficiently in dispute where employees who spoke to personnel manager knew about such activity). And the fact that Nwanna's termination proposal was faxed from the prison's human resources office before he

picked up the transcript of his testimony there for review proves nothing except the irrelevant point that *Nwanna* hadn't seen the transcript before the termination proposal was prepared. Nwanna picked up the transcript from the personnel office in an unsealed envelope. As he points out–and the BOP does not deny–any number of people had access to it before that point. Indeed, the BOP offered no evidence that the transcript was given to Nwanna immediately upon its receipt in the personnel office, or that it was not read before it was delivered to him, or even that the substance of his testimony had not already been communicated to prison officials through another means. It is therefore still in dispute whether a decisionmaker knew about and reacted to his testimony.

Nwanna's evidence is also sufficient on his discriminatory discharge claim, which the BOP argues faces the additional hurdle presented by the so-called "same actor inference" arising from the fact that Warden Clark was ultimately responsible for both hiring and firing Nwanna. We have recognized an inference of nondiscrimination when the same individual both hired and fired the plaintiff based on the common-sense notion that someone who disliked or intended to discriminate against a person would never initially hire that person. *Roberts*, 172 F.3d at 452; *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 744–45 (7th Cir.1999); *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir.1996). Whether this inference could carry the day for the BOP is questionable since Warden Clark's termination decision was necessarily premised on facts filtered by subordinates in his administration. *See, e.g., Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir.1994). But in any event, the BOP's resort to the "same actor inference" is premature because, as we recently observed, it "is just something for the trier of fact to consider." *Herrnreiter v. Chicago Hous. Auth.*, 315

F.3d 742, 747 (7th Cir.2002); *accord Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir.1998); *see also John-son*, 170 F.3d at 745 ("[W]e have found no case in this or any other Circuit in which a plaintiff relying on circumstantial evidence to prove an improper motive was able to produce sufficient evidence to otherwise sustain his burden on summary judgment and yet was foreclosed from the possibility of relief by the same-actor inference.").

Accordingly, we AFFIRM the district court's order granting summary judgment on Nwanna's disparate treatment claim, but VACATE the order and remand it for further proceedings on Nwanna's claim that he was fired in retaliation for engaging in protected activity and due to unlawful discrimination.