143 T.C. No. 3

UNITED STATES TAX COURT

RERI HOLDINGS I, LLC, HAROLD LEVINE, TAX MATTERS PARTNER,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9324-08.　　　　　　　　　　Filed August 11, 2014.

LLC1 contributed a successor member interest in a second LLC (LLC2) to University. R moves for partial summary judgment that (1) the actuarial tables under I.R.C. sec. 7520 do not apply to value the successor member interest and (2) TMP failed to substantiate the value of the successor member interest with a qualified appraisal as defined in sec. 1.170A-13(c)(3), Income Tax Regs.

<u>Held</u>: <u>Pierre v. Commissioner</u>, 133 T.C. 24 (2009), followed; LLC2, a disregarded entity, is not disregarded in determining value of the successor member interest in LLC2 that LLC1 contributed to University.

<u>Held</u>, <u>further</u>, <u>Estate of Gribauskas v. Commissioner</u>, 116 T.C. 142 (2001), <u>rev'd and remanded</u>, 342 F.3d 85 (2d Cir. 2003), distinguished on ground that successor member interest involved right to receive a capital asset in the future and not a stream of fixed payments.

<u>Held</u>, <u>further</u>, we will deny R's motion.

Randall Gregory Dick and Rebekah E. Schechtman, for petitioner.

Travis Vance III, Kristen I. Nygren, John M. Altman, and Leon St. Laurent, for respondent.

OPINION

HALPERN, Judge: This is a partnership-level action brought in response to a notice of final partnership administrative adjustment. The action involves RERI Holdings I, LLC (RERI). On its 2003 income tax return RERI reported a charitable contribution of property worth $33,019,000. Respondent determined that RERI overstated the value of the contribution by $29,119,000. He also determined that, on account of the overstatement, he would apply an accuracy-related penalty to any resulting underpayment of income tax. Petitioner assigned error to respondent's determinations. Respondent answered, supporting his determination that RERI had overstated the value of the contribution with the allegation that the transaction giving rise to RERI's charitable contribution "is a sham for tax purposes or lacks economic substance, and therefore the transaction should be disregarded for federal tax purposes and the deduction disallowed in its entirety."

The case is presently before us on respondent's motion for partial summary judgment (motion). Respondent moves for partial summary adjudication in his favor that (1) the actuarial tables under section 7520[1] do not apply to value the future (remainder) interest in property that RERI contributed to the University of Michigan (University) in 2003 and (2) RERI failed to substantiate the value of its contribution with a qualified appraisal. Petitioner objects. We will deny the motion.

## Background

Previously in this case we disposed by order of a motion by respondent for partial summary judgment[2] and by Memorandum Opinion and order of a motion by petitioner for partial summary judgment. RERI Holdings I, LLC v.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2003, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent moved for partial summary adjudication in his favor that, if the valuation tables provided for in sec. 7520 are to be used in valuing the charitable contribution in issue, the value of the real property underlying the contribution must be reduced by (1) depreciation and (2) the entire amount of the indebtedness encumbering the underlying property. By order dated May 5, 2011 (order), we granted that motion with respect to respondent's first prayer and denied it with respect to his second prayer, which we treated as asking for judgment that the charitable contribution had to be reduced by the amount of the indebtedness. We denied the motion on the ground that there was a genuine dispute as to a material fact. See Rule 121(b).

<u>Commissioner</u>, T.C. Memo. 2014-99 (rejecting petitioner's claim that, as a matter of law, the doctrines of "sham" and "lack of economic substance" are inapplicable to the determination of whether a taxpayer's charitable contribution is allowed under section 170). In doing so we relied on certain facts that we believed are not in dispute. We shall, therefore, with minor modifications and additions as relevant to the motion, again rely on those facts. The facts we rely on are as follows.

RERI

RERI was formed as a Delaware limited liability company on March 4, 2002. It was dissolved on May 11, 2004. RERI is classified as a partnership for Federal income tax purposes. For 2003, RERI filed a Form 1065, U.S. Return of Partnership Income (return).

The Charitable Contribution

RERI reported on the return as a charitable contribution its transfer to the Regents of the University of what RERI described on the return as "100% of the remainder estate in the membership interest in H.W. Hawthorne Holdings, LLC" (Holdings). Holdings, RERI reported, "owns all of the membership interest of a ['single purpose, single member'] Delaware limited liability company". That Delaware LLC is RS Hawthorne, LLC (Hawthorne), which RERI described on the return as owning "the fee simple absolute in a parcel of land improved as a AT&T

web hosting facility located at 2301 West 120th Street, Hawthorne, California"

(Hawthorne property).

Red Sea Tech I, Inc.

The Hawthorne property had come to be owned by Hawthorne on February 6, 2002, pursuant to Hawthorne's execution of a real estate contract that Hawthorne had received from Red Sea Tech I, Inc. (Red Sea). Hawthorne purchased the Hawthorne property from InterGate LAII, LLC (Intergate), for $42,350,000. To fund that purchase, Hawthorne borrowed $43,671,739 from Branch Banking & Trust Co. (BB&T), signing a promissory note (promissory note or note) and securing its repayment obligation by, among other things, a deed of trust (mortgage) and an "Absolute Assignment of Rents and Lease". The promissory note called for payments in installments (including interest) over a period of 14 years and 3 months (February 15, 2002--May 15, 2016), with the final payment, due May 15, 2016, constituting a "balloon" payment of $11.8 million. AT&T occupied the Hawthorne property pursuant to a triple net lease between it and Intergate. That lease had commenced on December 1, 2000, and was for a term of 15½ years, until May 31, 2016, with AT&T having three renewal options of 5 years each.

The Temporal Interests

Initially, Red Sea was the sole member of Holdings. On February 7, 2002, Red Sea created two temporal interests in its membership interest in Holdings (Holdings membership interest or, sometimes, Holdings)--a possessory term of years member interest (TOYS interest) and a future, successor member interest (SMI). The TOYS interest commenced in February 2002 and is to run almost 18 years, through December 31, 2020. The SMI becomes possessory on January 1, 2021, on termination of the TOYS interest.

Sale to RJS

RJS Realty Corp. (RJS) is a Delaware corporation. On February 7, 2002, RJS purchased the SMI for $1,610,000. By the agreement of sale (assignment agreement), among other things, Red Sea agreed to prohibit Holdings or Hawthorne from encumbering the Hawthorne property without the consent of RJS. Red Sea also agreed to prohibit the transfer of any interest in the Hawthorne property or the creation of any "lien or encumbrance" on the property that would "materially adversely affect" its value. The assignment agreement limits Red Sea's (and any successor in interest's) liability for breach of the agreement. An assignee's recourse for breach of the agreement is limited to the interest (the TOYS interest) retained by Red Sea. The assignment agreement provides that it

"shall be interpreted and construed in a manner consistent with the common law of estates in property of the State of New York and the statutory scheme of future interests and estates in property of the State of New York that is set forth in the New York Estates, Powers and Trust Law as in effect on the date hereof".

## RERI's Purchase

On March 25, 2002, RJS sold the SMI to RERI for $2,950,000, RERI paying $1,880,000 in cash and executing a nonrecourse promissory note for the balance.

## The Gift Agreement

On August 27, 2003, RERI's principal investor, Stephen M. Ross, pledged that he would make a gift of $4 million (later increased to $5 million) to the University for the benefit of its Department of Athletics (gift agreement).

Under the gift agreement, Mr. Ross pledged and agreed "to transfer, or to have transferred" the SMI to the University no later than December 31, 2003. Upon receiving the SMI, the University was to hold it at a nominal value of $1 and credit Mr. Ross' pledge in the amount of $1. The University agreed to hold the SMI for a minimum of two years, "after which the University shall sell" the SMI and credit Mr. Ross' account "to a value equal to the net proceeds received by the University" for the SMI. RERI's donation of the SMI to the University was

completed on the same day as the gift agreement, August 27, 2003.  Consistent

with the gift agreement, the agreement embodying RERI's donation of the SMI to

the University required the University to hold the SMI "for a period of two years".

(We shall hereafter refer to the University's obligations--first, to hold the SMI for

a minimum of two years and, then, to sell it--as the two-year hold-sell

requirement.)

Appraisal of the Hawthorne Property

    In September 2003, RERI retained Howard C. Gelbtuch of Greenwich

Realty Advisors to appraise a hypothetical remainder interest in the Hawthorne

property.  Mr. Gelbtuch concluded that the fair market value of "the leased fee

interest in the * * * [Hawthorne] property as of August 28, 2003, is US

$55,000,000", and that the "investment value" of a hypothetical remainder interest

in that property vesting on January 1, 2021, was $32,935,000.[3]  Mr. Gelbtuch

determined that value by multiplying his valuation of the underlying leased fee

interest by an actuarial factor taken from the tables promulgated under sections

2031 and 7520.  See sec. 20.2031-7(d)(1), Estate Tax Regs. (2003); sec. 1.7520-

---

[3]The appraisal and professional fees were calculated as $84,000, for a total
reported charitable contribution by the partnership of $33,019,000.

1(a)(1), Income Tax Regs. (2003).[4] In his appraisal report, Mr. Gelbtuch states that he was "advised that the applicable Remainder Interest Actuarial Factor as provided in Section 7520 of the Internal Revenue Code of 1986 for the month of contribution is .598793705." Mr. Gelbtuch appraised the leased fee interest assuming that it was "free and clear of any and all liens or encumbrances".

Sale of the SMI

On or about December 23, 2005, after the expiration of the required two-year holding period, and after obtaining its own appraisal of the remainder interest in the Hawthorne property as of July 20, 2005, which valued that interest at $6.5 million (on the basis of a "Reversion Value" of the Hawthorne property after 15 years), the University sold the SMI to HRK Real Estate Holdings, LLC (HRK), a Delaware LLC indirectly owned by petitioner and one of his associates, for $1,940,000.[5]

---

[4]Mr. Gelbtuch was asked to and did, in fact, appraise a hypothetical remainder interest in the Hawthorne property, not the SMI.

[5]As a result of petitioner's donation of the SMI to the University and other donations of similar successor member interests in other LLCs arranged by Mr. Ross, the University derived sale proceeds of $4,276,604, which it credited to Mr. Ross' $5 million pledge. Respondent alleges that, in at least some of those cases, the amounts realized by the University on its sales of the donated successor remainder member interests were far less than the appraisal thereof for which the donor, presumably, claimed a sec. 170 deduction.

HRK had pre-sold the SMI to a third-party individual for $3 million on or about December 20, 2005. On December 26, 2005, that third party donated the SMI to another charitable organization and claimed a charitable contribution deduction of $29,930,000 in connection therewith, again on the basis of an appraisal by Mr. Gelbtuch of a hypothetical remainder interest in the Hawthorne property.

## Discussion

I. Summary Judgment

Pursuant to Rule 121(a), "[e]ither party may move, with or without supporting affidavits or declarations, for a summary adjudication in the moving party's favor upon all or any part of the legal issues in controversy." A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). A summary judgment may be made upon part of the legal issues in controversy. See id. In response to a motion for summary judgment, an adverse party may not rest upon mere allegations or denials of the moving party's pleading but "must set forth specific facts showing that there is a genuine dispute for trial." Rule 121(d).

II.     Application of the Actuarial Tables Under Section 7520 in Valuing the SMI

   A.     Applicable Law

   Section 170(a)(1) allows a deduction for "any charitable contribution * * * made within the taxable year * * * only if verified under regulations prescribed by the Secretary."  Section 1.170A-1(c)(1), Income Tax Regs., generally provides that the amount of a contribution "made in property other than money * * * is the fair market value of the property at the time of the contribution".  Section 1.170A-1(c)(2), Income Tax Regs., provides that "fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."

   In most cases, the willing buyer-willing seller standard is not applied directly to annuities, life estates, terms of years, remainders, reversions and similar partial interests in property.  In general, those interests are valued by determining the fair market value of the underlying property and dividing the value among the several interests in the property on the basis of their present values.  In pertinent part, section 7520(a) provides with respect to remainder interests:

SEC. 7520(a). General Rule.--For purposes of this title, [i.e., title 26, U.S.C., the Internal Revenue Code] the value of any * * * remainder * * * interest shall be determined--

(1) under tables prescribed by the Secretary, and

(2) by using an interest rate (rounded to the nearest 2/10ths of 1 percent) equal to 120 percent of the Federal midterm rate in effect under section 1274(d)(1) for the month in which the valuation date falls.

If an income * * * tax charitable contribution is allowable for any part of the property transferred, the taxpayer may elect to use such Federal midterm rate for either of the 2 months preceding the month in which the valuation date falls for purposes of paragraph (2). * * *

Section 1.7520-1(a)(1), Income Tax Regs.,[6] applicable to remainder interests, provides: "Except as otherwise provided in this section and in § 1.7520-3 (relating to exceptions to the use of prescribed tables under certain circumstances), in the case of certain transactions after April 30, 1989, subject to the income tax, the fair market value of * * * remainders * * * is their present value determined under this section." Section 1.7520-1(c), Income Tax Regs., generally provides that "present value" is to be computed by using tables (section 7520 tables) reflecting the section 7520 interest rate component and, if necessary, the mortality component described in the section 7520 regulations. See also

---

[6]The regulations cited and discussed herein are those that were in effect for 2003, the year in issue.

section 1.7520-2(a)(1), Income Tax Regs., which provides: "Valuation.--Except as otherwise provided in this section and in § 1.7520-3 * * * the fair market value of * * * remainders * * * for which an income tax charitable deduction is allowable is the present value of such interests determined under § 1.7520-1."

Section 1.7520-3(b)(1)(i)(C), Income Tax Regs., describes an "ordinary remainder or reversionary interest" as "the right to receive an interest in property at the end of one or more measuring lives or some other defined period." The regulation provides that such an interest may be present-valued using a "standard section 7520 remainder factor" as defined therein. Id.

Section 1.7520-3(b)(1)(ii), Income Tax Regs., describes a "restricted beneficial interest", in part, as a remainder interest "that is subject to a contingency, power, or other restriction, whether the restriction is provided for by the terms of the * * * governing instrument or is caused by other circumstances." That regulation further provides: "In general, a standard section 7520 * * * remainder factor may not be used to value a restricted beneficial interest." Id. It provides, however, that "a special section 7520 * * * remainder factor may be used to value a restricted beneficial interest under some circumstances", citing an

example in section 1.7520-3(b)(4), Income Tax Regs., that is not germane to this case.[7]  Id.

If neither the section 7520 tables nor a special section 7520 factor is applicable to determining the value of a remainder interest, then the fair market value of the remainder interest is determined without regard for section 7520 on the basis of all of the facts and circumstances.  See sec. 1.7520-3(b)(1)(iii), Income Tax Regs.

Section 1.7520-3(b)(2), Income Tax Regs., is entitled "Provisions of governing instrument and other limitations on source of payment."  Section 1.7520-3(b)(2)(iii), Income Tax Regs., provides with respect to remainder and reversionary interests:

---

[7]As discussed infra pp. 37-39, respondent alleges that the SMI was a restricted beneficial interest precluding Mr. Gelbtuch's use of the sec. 7520 tables. Respondent appears to treat that preclusion as mandated by and synonymous with the statement in sec. 1.7520-3(b)(1)(ii), Income Tax Regs., that "[i]n general, a standard section 7520 * * * remainder factor may not be used to value a restricted beneficial interest."  Petitioner does not allege the right to file on RERI's behalf a ruling request under sec. 1.7520-1(c), Income Tax Regs., seeking from respondent a "special section 7520 * * * remainder factor" in order to value the SMI.  See sec. 1.7520-3(b)(1)(ii), Income Tax Regs.  Nor do the parties discuss the possible use of such a factor herein in lieu of the "standard" sec. 7520 factor or what that might mean in arriving at a value of the SMI.  Therefore, we will address the issue as framed by the parties:  whether petitioner is entitled to use the sec. 7520 tables (i.e., a "standard" sec. 7520 remainder factor) in valuing the SMI.

(iii) Remainder and reversionary interests.  A standard section 7520 remainder interest factor for an ordinary remainder or reversionary interest may not be used to determine the present value of a remainder or reversionary interest (whether in trust or otherwise) unless, consistent with the preservation and protection that the law of trusts would provide for a person who is unqualifiedly designated as the remainder beneficiary of a trust for a similar duration, the effect of the administrative and dispositive provisions for the interest or interests that precede the remainder or reversionary interest is to assure that the property will be adequately preserved and protected (e.g., from erosion, invasion, depletion, or damage) until the remainder or reversionary interest takes effect in possession and enjoyment.  This degree of preservation and protection is provided only if it was the transferor's intent, as manifested by the provisions of the arrangement and the surrounding circumstances, that the entire disposition provide the remainder or reversionary beneficiary with an undiminished interest in the property transferred at the time of the termination of the prior interest.

See also section 1.7520-3(b)(2)(ii)(A), Income Tax Regs., which, in addressing the requirements of a "governing instrument" with respect to "[i]ncome and similar interests", provides that the income beneficiary's interest is adequately protected (i.e., is an ordinary beneficial interest subject to valuation using a "standard section 7520 income factor") "only if it was the transferor's intent, as manifested by the provisions of the governing instrument and the surrounding circumstances, that the trust provide an income interest for the income beneficiary during the specified period of time that is <u>consistent with the value of the trust corpus and with its preservation</u>."  (Emphasis added.)

The wasting nature of depreciable and depletable real property is reflected in a special rule requiring that, in determining the value of a remainder interest in real property for purposes of section 170 (allowing an income tax deduction for any charitable contribution), depreciation and depletion be taken into account. Section 170(f)(4) provides: "For purposes of this section, in determining the value of a remainder interest in real property, depreciation (computed on the straight line method) and depletion of such property shall be taken into account, and such value shall be discounted at a rate of 6 percent per annum, except that the Secretary may prescribe a different rate."

B.     Whether on the Authority of Pierre v. Commissioner We Should Disregard the Check-the-Box Regulations in the Context of a Valuation for Purposes of Section 170, and, if So, Whether That Disregard Necessarily Invalidates Mr. Gelbtuch's Valuation as a Valuation of the SMI Because He Improperly Applied the Section 7520 Tables to the Hawthorne Property Rather Than to the Value of the Holdings Membership Interest

1.     The Parties' Arguments

Respondent argues that Mr. Gelbtuch improperly appraised a hypothetical remainder interest in the Hawthorne property rather than the SMI that RERI did, in fact, donate to the University. He argues that, assuming the section 7520 tables are applicable to value the SMI, the section 7520 remainder interest factor should have been applied "to the fair market value of Holdings, a recognized legal entity

formed under Delaware law, rather than [to] the market value of the Hawthorne Property."

Petitioner defends Mr. Gelbtuch's application of the section 7520 tables to the fair market value of the Hawthorne property on the ground that both Holdings and its wholly owned subsidiary, Hawthorne, which owned the Hawthorne property, were LLCs wholly owned by Red Sea and, therefore, were "disregarded entities" pursuant to section 301.7701-3(b)(1)(ii), Proced. & Admin. Regs. Petitioner argues that our Opinion in Pierre v. Commissioner, 133 T.C. 24 (2009), in which we held that an LLC constituting a disregarded entity under the foregoing regulation may not be disregarded for purposes of valuing the gift of an interest therein, is applicable only for Federal gift tax purposes, not for purposes of determining the income tax deduction for a charitable contribution of an interest in a disregarded LLC, the sole asset of which is an interest in real estate. Respondent rejects petitioner's reliance on the check-the-box regulations to disregard Holdings and Hawthorne, noting that, although this Court "considered * * * [the] issue in the context of the federal gift tax provisions, the Tax Court's rationale in Pierre is equally applicable to the instant case."

Petitioner, recognizing that Pierre involved gifts and valuations of fractional interests in an LLC, posits that "had 100% of the Pierre LLC interests been

transferred to one person the Court in <u>Pierre</u> would have agreed that no discounts were appropriate"; i.e., that the transferred LLC interests and the underlying assets represented thereby would be of equal value.  In further support of that argument, petitioner notes that "respondent fails to discuss how one would go about valuing the interests transferred since the 100% owner of the LLC could collapse the structure, terminating the LLC", again suggesting that the SMI and the remainder interest in the Hawthorne property were of equal value.  Similarly, in defending the Gelbtuch appraisal as a "qualified appraisal" under section 1.170A-13(c)(3), Income Tax Regs., petitioner questions how an appraisal of the SMI "would produce a different result as the underlying asset would still have to be valued", and he further notes:  "[w]hile respondent argues the wrong property was * * * valued, * * * [he] does not suggest how else the value of the * * * [SMI] would be determined."  Thus, petitioner suggests that, even if Mr. Gelbtuch did apply the section 7520 tables to a fair market valuation of the wrong property, that impropriety was of no economic consequence and, therefore, should be ignored.

2.     Analysis

a.     Applicability of Pierre

In Pierre, the LLC, wholly owned by the individual donor of the fractional interests therein, was validly formed under New York law.  We determined that, even though the LLC was a disregarded entity under the check-the-box regulations, that designation did not control the valuation of the fractional LLC interests transferred by the donor taxpayer for Federal gift tax purposes.  In holding that the gifts were of fractional interests in the LLC rather than of pro rata shares of the LLC's underlying assets, we noted that, under New York law, the taxpayer "did not have a property interest in the underlying assets of" the LLC and that "Federal law could not create a property right in those assets."  Pierre v. Commissioner, 133 T.C. at 29-30.  We further noted that the question of how the transfer of an ownership interest in an LLC should be valued for Federal gift tax purposes "is not the question addressed by the check-the-box regulations".  Id. at 35.

We also find significant Judge Cohen's admonition in her concurring opinion (joined by 8 of the other 9 Judges joining in the 10-Judge majority opinion), that "[w]here the property transferred is an interest in a single-member

LLC * * * validly created and recognized under State law, the willing buyer cannot be expected to disregard that LLC." Id. at 37.

We were faced in Pierre, as we are faced here, with identifying the appropriate property against which to apply the customary willing seller and willing buyer standard (here, as a first step in applying the section 7520 tables). The customary willing seller and willing buyer standard is described in substantially identical language both for valuing charitable contributions of property for income tax purposes and for valuing gifts of property for gift tax purposes. Compare sec. 1.170A-1(c)(2), Income Tax Regs., with sec. 25.2512-1, Gift Tax Regs. See sec. 20.2031-1(b), Estate Tax Regs. (same definition for estate tax valuations). And it is only on account of a charitable contribution deduction provided for in the gift tax statute that gifts to charity are not included in the amount of taxable gifts. See sec. 2522. We see no reason to identify the property to be valued for income tax purposes (and subject to a charitable contribution deduction) differently from the property to be valued for gift tax purposes (and subject to a charitable contribution deduction).[8]

---

[8]Nevertheless, the value of a remainder interest in real property contributed to a qualified charitable organization may be greater for gift tax or estate tax purposes than it is for income tax purposes. Unlike sec. 170(f), neither the gift tax nor the estate tax provisions contain an express requirement that depreciation or

(continued...)

Thus, we agree with respondent that, on the rationale of <u>Pierre</u>, for purposes of determining the value of RERI's charitable contribution to the University, the property RERI transferred to the University was the SMI.  We also agree with respondent that, on the face of it, Mr. Gelbtuch did not determine the value of the SMI; rather, on the face of it, by applying the section 7520 tables to the value of the Hawthorne property, he determined the value of a hypothetical remainder interest in that property.  The question is whether the latter value may serve as an acceptable substitute for the former value.

---

[8](...continued)
depletion be taken into account in determining the value of a remainder interest in real property.  Apparently, the Commissioner takes that omission to be intentional. <u>See</u> Rev. Rul. 76-473, 1976-2 C.B. 306 (gift tax value of charitable remainder interest in personal residence following 20-year possessory interest determined without taking into consideration depreciation for period before charity's possession.  "The value of the charitable remainder interest is higher for gift tax purposes than for income tax purposes."); <u>see also</u> <u>Nat'l Bank of Commerce in Memphis v. United States</u>, 422 F.2d 1074, 1076 (6th Cir. 1970) (estate tax deduction for transfer of charitable remainder computed simply by multiplying current asset value by factor from tables); <u>Estate of Bachman v. Commissioner</u>, T.C. Memo. 1975-186 (to same effect).

b.  Whether Mr. Gelbtuch's Application of the Section 7520 Tables to the Value of the Hawthorne Property Necessarily Invalidates Mr. Gelbtuch's Valuation as a Valuation of the SMI

On the basis of the rationale of Pierre, the property that RERI transferred to the University was the SMI, and it thus would have been no error for Mr. Gelbtuch to have determined the value of the Holdings membership interest and to have applied the section 7520 tables to that value to determine the value of the SMI. That, however, does not necessarily mean that RERI fatally erred in determining the value of the SMI by having Mr. Gelbtuch determine the value of a hypothetical remainder interest in the Hawthorne property. Pierre involved transfers of present interests in a single-member LLC to two trusts, which interests, because of discounts for lack of marketability and control, were argued to be worth less than the donees' pro rata shares of the assets of the LLC. Petitioner points out that RERI transferred to the University a future interest in Holdings that, when it becomes a present (possessory) interest at the termination of the TOYS interest, will encompass 100% of the membership interest in Holdings. Therefore, petitioner argues, there is not necessarily any difference between the value of the property owned by Holdings indirectly (the Hawthorne property) and the value of the property (Holdings) to which Mr. Gelbtuch should have applied the section

7520 tables in determining the value of the SMI. It follows, petitioner suggests, that, absent restrictions applicable to one and not the other, see discussion infra, there is no difference between the value of Holdings and the value of the leased fee interest in the Hawthorne property that was, in effect, Holdings' sole asset. If so, petitioner continues, then Mr. Gelbtuch's valuation of the latter, in effect, would have constituted a valuation of the former, so that the section 7520 tables could properly be applied to the latter in arriving at a value for the SMI. In response to petitioner's suggestion, respondent admits that, "[i]n normal course, there exists a unity of interest between a single-member entity and the assets owned by such entity."[9] But he argues that Red Sea's split of Holdings into the TOYS interest and the SMI gave rise to "'a multiple ownership structure' unlike where one party owned 100 percent."

It is true that Red Sea did divide the Holdings membership interest into a present (TOYS) interest and a future (SMI) interest; it is also true that, applying the section 7520 tables to determine the present value of each, neither value is equal to the combined value of the two interests. Pursuant to section 7520 and its

_____

[9]In support of that statement, respondent states: "See e.g., Pierre at 43 (Halpern, dissenting) citing 18 C.J.S., Corporations, at § 4 (2007) and Smart v. Int'l Bd. of Elec. Workers, Local 702, 315 F.3d 721, 723 (7th Cir. 2002) regarding the rule of unity which exists amongst a sole proprietor and such entrepreneur's business."

implementing regulations, the method for determining the value of an ordinary

income interest or an ordinary remainder interest (or, in some cases, an income or

a remainder interest constituting a restricted beneficial interest) is to determine the

fair market value of the property out of which the two interests were created and to

divide that value among the two interests on the basis of their present values.  See

1.7520-1(a)(1), Income Tax Regs.  For a remainder interest following a term of

years interest, the section 7520 tables reflect only interest rate and timing

variables.  See sec. 1.7520-1(c), Income Tax Regs.  But, if those section 7520

tables do apply to value the SMI, they fully reflect Congress' and the Secretary's

concerns that the SMI represents less than the 100% of the Holdings membership

interest.  And if it can be assumed that (1) the Hawthorne property and Holdings

are of equal value and (2) no restrictions burden the SMI, then nothing may be lost

in allowing the Hawthorne property to substitute for the Holdings membership

interest in applying the section 7520 tables to determine the value of the SMI.[10]

_____

[10]We note in passing that, in valuing the Hawthorne property, Mr. Gelbtuch assumed that it was unencumbered by any indebtedness.  Our intuition is that any valuation of Holdings (a holding company) would reflect Hawthorne's net asset value (i.e., the value of its assets less the value of its liabilities), thus taking into account the liability represented by the promissory note and the mortgage.  In that event, Mr. Gelbtuch's valuation of the Hawthorne property on the assumption that it was "free and clear of any and all liens or encumbrances" could not be considered a substitute for a valuation of Holdings, and, hence, his valuation of a

(continued...)

There is an unresolved issue of fact concerning whether the value of a hypothetical remainder interest in the Hawthorne property can stand proxy for the SMI. That issue involves the two-year hold-sell requirement imposed on the University with respect to its possession of the SMI. Does that requirement cause the SMI to be a restricted beneficial interest for which a standard section 7520 remainder factor may not be applied to determine fair market value, see sec. 1.7520-3(b)(1)(ii), Income Tax Regs., or, if not, does it at least reduce the value of the SMI below that of a hypothetical remainder interest in the Hawthorne property? We discuss the restricted beneficial interest issue infra pp. 37-50.

If we determine the fact issue adversely to petitioner, we would agree with respondent that Mr. Gelbtuch's application of the section 7520 tables to the fair market value of the Hawthorne property necessarily resulted in a valuation (of a hypothetical remainder interest therein) that may not substitute for a valuation of the SMI.[11] If, on the other hand, we are persuaded that an appraisal of a

---

[10](...continued)
hypothetical remainder interest in the Hawthorne property (applying the sec. 7520 tables to the debt-free value of that property), could not be considered a substitute for a valuation of the SMI. It is incumbent on the parties to address that issue at the appropriate time. In the order, see supra note 2, we did not address that specific issue.

[11]The same would be true should we ultimately determine that Mr.

(continued...)

hypothetical remainder interest in the Hawthorne property can substitute for an appraisal of the SMI, we would be inclined to apply the often invoked principle of "[n]o harm; no foul", see, e.g., King v. Nat'l Human Res. Comm., Inc., 218 F.3d 719, 724 (7th Cir. 2000), and reject respondent's argument that we must, as a matter of law, disregard Mr. Gelbtuch's appraisal because he improperly applied the section 7520 tables to the fair market value of the Hawthorne property rather than to the fair market value of Holdings. It would be premature to apply that principle herein, however, because there exist unresolved questions of both law and fact.

C.     Whether the Regulations Preclude Application of the Section 7520 Tables to Value the SMI

1.     Introduction

The SMI is a remainder interest in Holdings, and its fair market value is its present value determined by applying the section 7520 tables only if (1) the SMI is an ordinary remainder interest and the provisions of section 1.7520-3(b)(2)(iii), Income Tax Regs. (requiring that preservation and protection of the underlying property (the Holdings membership interest) is assured) are satisfied or (2) the

---

[11](...continued)
Gelbtuch's appraisal cannot substitute for a valuation of the SMI because of his failure to take the mortgage into account.

SMI is a restricted beneficial interest for which a standard section 7520 remainder factor may be used. See sec. 1.7520-3(b)(1)(ii), Income Tax Regs.

### 2. Summary of the Parties' Arguments

Respondent's principal argument is that section 1.7520-3(b)(2)(iii), Income Tax Regs., precludes application of the section 7520 tables to determine the value of the SMI. Respondent argues that, because the holder of the SMI does not "enjoy the same protections as would be afforded to a trust remainderman", there is no assurance that such holder "will receive the Hawthorne Property in its original form." Respondent worries about devaluation of the Holdings membership interest because of depreciation of the Hawthorne property, its sale, or additional or unpaid mortgage indebtedness. Therefore, respondent argues, whether the SMI constitutes an ordinary remainder interest or not, the preservation and protection requirements of section 1.7520-3(b)(2)(iii), Income Tax Regs., preclude application of the section 7520 tables.

Additionally, respondent argues that, because of the two-year hold-sell requirement, the SMI is a restricted beneficial interest within the meaning of section 1.7520-3(b)(1)(ii), Income Tax Regs., to which the section 7520 tables cannot be applied.

Petitioner argues that the SMI follows a term of years interest (i.e., the TOYS interest) and is therefore an ordinary remainder interest within the meaning of section 1.7520-3(b)(1)(i)(C), Income Tax Regs. Petitioner rejects respondent's reading of section 1.7520-3(b)(2)(iii), Income Tax Regs., arguing that "the regulation basically provides * * * consistent with the laws of trusts, * * * [that] the trustee * * * must protect against waste." He further argues that "the regulation simply provides that the interest of the property [e.g., a remainder interest] as opposed to its value, be undiminished", and that it is only "concerned with the initial beneficiary having the power to utilize the assets of the trust so that there is a real possibility that there will be nothing or little left for a remainderman." Petitioner also "discerns" from the regulatory language "that the interest being discussed is a remainder interest in a trust and not a remainder interest in real property." Petitioner argues that the SMI holder's right to protect its interest arises under contract and property law, not trust law (i.e., the SMI holder is not the remainder beneficiary of a trust), and that, in any event, the SMI is adequately protected by the severe limitations in the Red Sea-RJS assignment agreement on the right of the TOYS interest to encumber the Hawthorne property. He thinks that respondent overstates the possibility of a devaluation of the Holdings membership interest, arguing that depreciation does not preclude the use

of the section 7520 tables and that respondent's concern that the remainder will be diminished in value is "so remote as to be negligible."

Lastly, petitioner disputes respondent's argument that the two-year hold-sell requirement renders the SMI a restricted beneficial interest to which the section 7520 tables are inapplicable. Rather, petitioner argues, a restriction on the right to dispose of an interest in property is not the type of restriction contemplated in the regulation, section 1.7520-3(b)(1)(ii), Income Tax Regs., defining the term "restricted beneficial interest."

### 3. Analysis

#### a. Introduction

We may summarily dispose of petitioner's argument that the preservation and protection requirements found in section 1.7520-3(b)(2)(iii), Income Tax Regs., apply only with respect to property held in trust. They do not. The parenthetical in the first sentence of the regulation makes that quite clear: "A standard section 7520 remainder interest factor for an ordinary remainder * * * interest may not be used to determine the present value of a remainder * * * interest (whether in trust or otherwise) unless". Id. (emphasis added).

Therefore, for respondent to prevail on his claim that the section 7520 tables are inapplicable in determining the fair market value of the SMI, he must show

either (1) that the SMI is an ordinary remainder interest for which the preservation and protection requirements of section 1.7520-3(b)(2)(iii), Income Tax Regs., are not satisfied or (2) that the SMI is a restricted beneficial interest whose value may not be determined by application of a standard section 7520 remainder factor.

### b. Preservation and Protection of the Property

### i. Risk of Hawthorne's Encumbering or Selling the Hawthorne Property

Respondent argues that, because Hawthorne may encumber or sell the Hawthorne property, there is no assurance that the value of the Holdings membership interest will be preserved and protected until the holder of the SMI comes into possession of that interest. See sec. 1.7520-3(b)(2)(iii), Income Tax Regs. As stated supra in our background discussion, by the assignment agreement, Red Sea agreed to prohibit Holdings or Hawthorne from encumbering the Hawthorne property without the consent of RJS, the initial transferee of the SMI under that agreement. By that agreement, Red Sea also agreed to prohibit the transfer of any interest in the Hawthorne property or the creation of any "lien or encumbrance" on that property that would "materially adversely affect" its value. Respondent argues that, in the event the Hawthorne property is either sold or

encumbered in violation of the assignment agreement,[12] RJS and, subsequently, RERI and the University, as owners of the SMI, would have the right, under that agreement, only "to receive, as damages, the very interest promised", i.e., the SMI. Thus, respondent concludes, "the successor member interest holder is afforded substantially less protection than that of a trust remainderman", in violation of the principal requirement for the use of a "standard section 7520 remainder interest factor" under section 1.7520-3(b)(2)(iii), Income Tax Regs. Petitioner responds that the risks that the SMI might be diminished by any such action are remote possibilities that, pursuant to regulations under section 170, are not to be taken into account in valuing a charitable contribution. See sec. 1.170A-1(e), Income Tax Regs. (possibility that charitable transfer will not become effective disregarded if, on the date of the gift, that possibility "is so remote as to be negligible"). Therefore, petitioner argues the assignment agreement does not lack assurance that the Holdings membership interest will be adequately preserved and protected.

---

[12]Both petitioner and respondent refer to the possibility that the owner of the TOYS interest might encumber the Hawthorne property. In fact, it would appear that Hawthorne, the owner of the property, would be the only person who could encumber the property. That is the occurrence actually contemplated (and prohibited without RJS' consent) by the parties to the assignment agreement.

Respondent has not shown that either Red Sea, Holdings, or Hawthorne intends a sale of the Hawthorne property. Moreover, the property into possession of which the SMI holder will come is the Holdings membership interest, not the Hawthorne property. Holdings' assets (whether held directly or indirectly) may change without necessarily putting into jeopardy the SMI holder's rights to future possession and enjoyment of a valuable Holdings membership interest. Similarly, respondent has not shown any intent to encumber the Hawthorne property in violation of the assignment agreement, except, perhaps, in connection with a refinancing or restructuring of the balloon payment. That possibility is acknowledged by petitioner should AT&T not exercise its option to renew its lease in May 2016, when the initial lease term is to expire and the $11.8 million balloon payment becomes due. But even in that event, it is not clear that such a refinancing would entail an additional, burdensome encumbrance on the Hawthorne property as a new mortgage would, presumably, replace the existing mortgage on the Hawthorne property and, therefore, not cause any diminution of the property's fair market value. Moreover, even if the Hawthorne property were otherwise encumbered, that would not necessarily put into jeopardy the SMI holder's rights to future possession and enjoyment of the Holdings membership interest.

Respondent has not made his case that the risk of Hawthorne's selling or encumbering the Hawthorne property jeopardizes the SMI holder's rights to future possession and enjoyment of the Holdings membership interest so as to preclude use of a standard section 7520 remainder interest factor to determine the present value of the SMI. See sec. 1.7520-3(b)(2)(iii), Income Tax Regs.[13] At best, respondent has identified a dispute as to a material issue of fact; i.e., Hawthorne's (and others') intentions.

ii. Risk of Nonpayment of the Promissory Note and Foreclosure

The parties differ sharply as to whether the possibility that Hawthorne will be unable to make the $11.8 million balloon payment on the May 15, 2016, due date poses a sufficient risk of foreclosure and sale of the Hawthorne property to

---

[13]We note in passing that, in discussing the limitation-on-liability provision of the assignment agreement, which respondent claims jeopardizes the SMI holder's future interest in the Holdings membership interest, respondent may have confused the TOYS interest and the SMI. That provision (paragraph C of the covenants portion of the assignment agreement) provides that, in the event of an assignor's (Red Sea's or one of its successor's) breach of the agreement, the assignee's (RJS' or one of its successor's, e.g., RERI's or the University's) recourse is limited to the assignor's "Retained Interest" (i.e., the TOYS interest) in Holdings. Respondent's claim is that the limitation-on-liability provision "only permits the successor member interest holder to receive, as damages, the very interest promised", i.e., the SMI. That is not the case. The SMI holder could receive as damages all of the TOYS interest, which, when united with the SMI, represents complete ownership of Holdings.

warrant a conclusion that the Holdings membership interest value will not be adequately preserved and protected for the benefit of the SMI. If there is sufficient risk of foreclosure, that would foreclose use of a standard remainder interest factor to determine the present value of the SMI. See sec. 1.7520-3(b)(2)(iii), Income Tax Regs. Petitioner views the risk as a remote contingency to be disregarded.

The record shows that the Hawthorne property is Hawthorne's only asset and that the AT&T lease is its only source of income. The promissory note calls for a final, $11.8 million balloon payment on May 15, 2016. By the end of May 2016 (the conclusion of the first term of the AT&T lease), Hawthorne should have received sufficient payments under the AT&T lease to have made all installment payments called for by the note and to have accumulated a surplus (assuming no distributions) of approximately $5.7 million. That would leave $6.1 million to be raised to make the balloon payment.

Petitioner views as remote the possibility of default on the balloon payment. Specifically, petitioner states:

> Petitioner submits that at the time of the donation it was expected that AT&T would exercise its option to renew the lease and thus the balloon payment paid. Defaulting on the final payment due on the loan was as remote as Hawthorne defaulting on the underlying mortgage. It can also be anticipated that at the time of the donation

the balloon payment would be refinanced or restructured or the premises leased to another party if AT&T did not exercise its option.

In response to those arguments, respondent continues to maintain that "there is a possibility that the balloon payment would not get paid, thus resulting in foreclosure or acquisition of the Hawthorne Property", in which event, "the SMI holder would possess a worthless membership interest in * * * [Holdings]." Respondent further argues that there is no evidence that the loan would be refinanced or even could be refinanced "due to the provisions petitioner relies upon to argue that encumbrances are not permitted", respondent's assumption apparently being that the parties would interpret such a replacement financing as the type of encumbrance that is prohibited by the Red Sea-RJS Assignment Agreement.

The foregoing arguments by both parties are based entirely on speculation. Respondent, whose motion it is we are considering, has not convinced us that Hawthorne, as obligor on the promissory note, would not be able to raise the more than $6 million needed to make the $11.8 million balloon payment on May 15, 2016. Nor has respondent convinced us that the risk of refinancing the remaining debt presents anything other than a conventional commercial risk that has little effect on the safety of Holdings as a long-term investment. Moreover, given

Hawthorne's expected payment of a substantial amount of principal (close to $32 million) before the due date of the balloon payment, what equity will Hawthorne have in the Hawthorne property, a portion of which might be recouped on a forced sale of the Hawthorne property to safeguard Holdings' (and the SMI's) value? Indeed, how will the value of the SMI interest be affected by the fact that principal payments under the promissory note are to be paid from rental income that, but for the assignment of rents to BB&T, it would seem should be distributed to the TOYS interest holder?[14] The only "fact" before us is the certainty that the lease payments will be insufficient (by more than $6 million) to enable Hawthorne to make that payment. And although, as petitioner argues, it was "expected" or "anticipated" at the time of RERI's gift of the SMI that there would be a refinancing, a lease extension, or a new lease, any one of which could have

---

[14]In response to respondent's prior motion for partial summary judgment, see supra note 2, petitioner stated that the mortgage would "be fully amortized by * * * the owner of the TOY[S] Interest". 1 Joseph Rasch & Robert F. Dolan, N.Y. Law & Practice of Real Property, sec. 6:27 (2d ed.) ("Payment of principal of mortgage") states in pertinent part:

> A life tenant is under no obligation to pay the principal of a mortgage encumbering the property; this must be paid by the remainderman. If the life tenant does pay it, he may recover such payment from the remainderman.[9]

> [FN9]Collins v McKenna (1921) 116 Misc 72, 189 NYS 433.

generated the funds needed to make the balloon payment, expectation and anticipation are not synonymous with certainty. Therefore, we find that the parties' dispute as to whether the risk of Hawthorne's defaulting on the $11.8 million balloon payment is the type of contingency that would jeopardize the value of Holdings and, thus, the value of the SMI, in contravention of section 1.7520-3(b)(2)(iii), Income Tax Regs., constitutes a dispute as to a material fact, which precludes summary adjudication that the risk of nonpayment of the balloon payment on the promissory note warrants a conclusion that Holdings' value will not be adequately preserved and protected for the benefit of the SMI.

### c.     Restricted Beneficial Interest

### i.     The Parties' Arguments

Respondent summarizes his position with respect to the impact of the two-year hold-sell requirement as follows:

> As a result of the "hold-sell" restrictions imposed by the Gift Agreement and the * * * [Assignment Agreement], the successor member interest was a restricted beneficial interest for purposes of section 7520. Furthermore, the consequence of these restrictions dictated that the University would never become the owner of the underlying Hawthorne Property or enjoy the benefits and burdens of * * * [owning that property].

Respondent concludes: "Since there was no intention to transfer an interest, which would be unrestricted prior to the expiration of the prior TOYS interest, the section 7520 tables may not be used."

In rebuttal to respondent's arguments, petitioner cites our conclusion in Estate of Gribauskas v. Commissioner, 116 T.C. 142, 165 (2001) (Estate of Gribauskas I), rev'd and remanded, 342 F.3d 85 (2d Cir. 2003) (Estate of Gribauskas II), involving the value of nonassignable future installments of lottery winnings, that "a restriction within the meaning of * * * [section 20.7520-3(b)(1)(ii), Income Tax Regs.] is one which jeopardizes receipt of the payment stream, not one which merely impacts on the ability of the payee to dispose of his or her right thereto." Petitioner also notes that we further stated in Estate of Gribauskas I that "the cases addressing attempts to avoid use of the [section 7520] tables * * * [generally] required a factual showing that renders unrealistic and unreasonable the return or mortality assumptions underlying the tables." Id. at 161. Petitioner states: "Not only is the * * * [SMI] not a restricted beneficial interest for purposes of section 7520, but such a determination is clearly factual and cannot be determined as a matter of law as sought by respondent."

Petitioner also relies upon two U.S. Courts of Appeals cases that hold that restrictions on the marketability of an income stream constituting an interest in

property are not the type of restriction that would render the section 7520 tables inapplicable in valuing the property interest. In <u>Cook v. Commissioner</u>, 349 F.3d 850, 854 (5th Cir. 2003), <u>aff'g</u> T.C. Memo. 2001-170, the Court of Appeals stated: "In enacting § 7520(a)(1) and requiring valuation by the tables, Congress displayed a preference for convenience and certainty over accuracy in the individual case." The Court of Appeals reiterated that statement in <u>Anthony v. United States</u>, 520 F.3d 374, 377 (5th Cir. 2008). In petitioner's view, the two-year hold requirement does not furnish a reason to abandon the judicial preference for valuing partial interests in property under the section 7520 tables.

Lastly, petitioner argues that the gift agreement embodying the sell requirement has no bearing on the issue because it did not affect the University's rights with respect to the property "as * * * [the University] would still own and control * * * [the SMI] regardless of whether * * * [it] adhered to the gift agreement."

ii. <u>Analysis</u>

(a) <u>The Two-Year Hold-Sell Requirement</u>

We find fault with both parties' analyses of the impact of the two-year hold-sell requirement.

Our principal problem with respondent's argument is his apparent assumption that no restricted beneficial interest may be valued using the section 7520 tables. Section 1.7520-3(b)(1)(ii), Income Tax Regs., provides that "[i]n general, a standard section 7520 * * * remainder factor may not be used to value a restricted beneficial interest." (Emphasis added.) The two-year hold-sell requirement is undeniably a restriction on the University's rights with respect to its ownership of the SMI. But that fact, in and of itself, does not provide a sufficient basis to conclude that the SMI is a restricted beneficial interest for which a standard section 7520 remainder factor may not be used to determine value. Respondent's position also ignores the admonition, uniformly expressed in the caselaw dealing with the application of the section 7520 tables, that those tables must be used "unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available" (unrealistic and unreasonable fair market value standard). Weller v. Commissioner, 38 T.C. 790, 803 (1962) (citations omitted). To the same effect, see Anthony, 520 F.3d at 383; Cook v. Commissioner, 349 F.3d at 854; Estate of Gribauskas II, 342 F.3d at 87; Shackleford v. United States, 262 F.3d 1028, 1031 (9th Cir. 2001). Therefore, we

reject respondent's premise that any restriction applicable to a remainder interest is, per se, a restriction that renders the interest a restricted beneficial interest for which use of the section 7520 tables is unavailable.

Petitioner agrees that application of the section 7520 tables is conditioned on nonviolation of the unrealistic and unreasonable fair market value standard. But he relies on our statements in Estate of Gribauskas I, 116 T.C. at 165, that a restriction on alienation is not a restriction covered by section 1.7520-3(b)(1)(ii), Income Tax Regs., defining a restricted beneficial interest. Petitioner also relies on Anthony and Cook, which reach the same result. Petitioner's argument overlooks two important facts. First, all three of the cited cases involve the valuation of a present right to a stream of income and not the valuation of a right to future possession of corpus. That distinction was drawn by the Court of Appeals in Cook v. Commissioner, 349 F.3d at 856, where it stated: "We agree that the right to alienate is necessary to value a capital asset; however, we think it unreasonable to apply a non-marketability discount when the asset to be valued is the right, independent of market forces, to receive a certain amount of money annually for a certain term." Second, our decision in Estate of Gribauskas I was reversed by Estate of Gribauskas II, which held that a restriction on marketability may constitute a restriction that prevents application of the section 7520 tables in

valuing an interest in property if it results in a violation of the unrealistic and unreasonable fair market value standard.[15]

We are not bound, pursuant to the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), to follow Estate of Gribauskas II because RERI, whose principal place of business was in New York, was dissolved in 2004. Therefore, it had no principal place of business when it filed its petition in 2008. As a result, the court to which, barring a written stipulation to the contrary, an appeal of this case would lie would be the Court of Appeals for the D.C. (not the Second) Circuit. See sec. 7482(b); Peat Oil & Gas Assocs. v. Commissioner, T.C. Memo. 1993-130, 1993 WL 95592, at *6. That court has not as yet addressed the material restriction on the transferability issue.

Nor are we bound by the doctrine of stare decisis to follow our holding in Estate of Gribauskas I in this case. Estate of Gribauskas I involved a promised stream of fixed payments and is thus distinguishable from the valuation problem here before us, the present value of the right to receive a capital asset in the future. And while that capital asset may itself represent nothing more than the expectation

---

[15]In so holding, the Court of Appeals for the Second Circuit followed the Court of Appeals for the Ninth Circuit in Shackleford v. United States, 262 F.3d 1028 (9th Cir. 2001), which reached that result. See Estate of Gribauskas v. Commissioner, 342 F.3d 85, 89 (2d Cir. 2003), rev'g and remanding 116 T.C. 142 (2001).

of a future income stream, we generally rely on market prices to determine the value of capital assets such as shares of stock because the value of such assets is not readily ascertainable absent a transfer from buyer to seller. See Cook v. Commissioner, 349 F.3d at 856.

We conclude that the impact of both the restriction on alienation (i.e., the two-year hold requirement) and the two-year sell requirement is a restriction that must be measured against the unrealistic and unreasonable fair market value standard. It is true, as petitioner argues, that the latter requirement is found only in the gift agreement and not in the assignment agreement. But, as a signatory to both agreements, the University was bound by both, and it is quite possible to interpret the two-year hold-sell requirement in the gift agreement as, in effect, a condition of Mr. Ross' $5 million pledge to the University thereunder. Disputes under the gift agreement were to be governed by Michigan law, and the assignment agreement was to be construed in accordance with Delaware law. Neither party has addressed Mr. Ross' rights under Michigan and Delaware law in the event the University were to violate the two-year hold-sell requirement. Thus, there remains a question of fact[16] as to whether that requirement constituted a

---

[16]See, e.g., Moulton v. Commissioner, T.C. Memo. 2009-38, 2009 WL 416010, at *5 (holding that the characterization of a claim under applicable State

(continued...)

meaningful restriction relating to the SMI because the University's violation thereof would have justified Mr. Ross' reneging on all or a portion of his pledge, thereby reducing the value of the SMI in the University's hands.[17]

Neither party has presented evidence with respect to the impact, if any, of the two-year hold-sell requirement on the fair market value of the SMI.[18]

---

[16](...continued)
law, in that case, for purposes of determining the applicability of the sec. 104(a)(2) exclusion from income of damages for physical injury, is a question of fact).

[17]In that regard, we note that, before RERI's sale of the SMI to HRK for $1,940,000, Mr. Ross had threatened to treat his pledge as offset by the full amount of HRK's offer of that amount if the University were to reject it and, later, sell the SMI for less.

[18]Even if the University's violation of the two-year hold-sell requirement would have had adverse economic consequences to the University, it is not clear that that violation would have had any impact on the actual value of the SMI (which is the relevant inquiry herein), as the violation would have been irrelevant to the purchaser of the SMI from the University. Conversely, if the University felt bound to abide by the requirement (as, apparently, it did), respondent argues that the "consequence" of the two-year hold-sell restriction "dictated that the University would never become the owner of the underlying Hawthorne Property or enjoy the benefits and burdens of * * * [owning it]." But respondent furnishes no evidence that that fact would have adversely affected the SMI's value. Moreover, it is arguable that the two-year hold restriction did not adversely affect value because, at the time of sale, the purchaser from the University would have been two years closer to possession than was the University when it acquired the SMI, a fact that might have enhanced its value; and the two-year sell restriction would not have been a factor in the negotiations between the University and any prospective purchaser because the latter would not have been restricted by it.

Therefore, the impact on the SMI's value of the two-year hold-sell restriction also presents issues of material fact.

      (b)      <u>Whether Use of the Section 7520 Tables Would Violate the Unrealistic and Unreasonable Fair Market Value Standard</u>

In <u>Estate of Gribauskas II</u>, 342 F.3d at 88, the Court of Appeals for the Second Circuit noted the Commissioner's agreement that the taxpayer's valuation of the income stream in that case (lottery winnings in the form of an annuity), which was more than $900,000 below the value prescribed by the section 7520 tables ($2,603,661.02 versus $3,528,058.22), accurately reflected the market discount attributable to the restrictions on transferability of the income stream. The court stated that, under those circumstances, "application of the tables would clearly 'produce a substantially unrealistic and unreasonable result'". <u>Id.</u> (quoting <u>O'Reilly v. Commissioner</u>, 973 F.2d 1403, 1408 (8th Cir. 1992), <u>rev'g</u> 95 T.C. 646 (1990)). On that basis, the court held that "valuing the winnings pursuant to the tables was erroneous." <u>Id.</u> In <u>Anthony</u>, 520 F.3d at 384, the Court of Appeals for the Fifth Circuit ignored a roughly 50% disparity between the taxpayer's expert valuation of a lottery winnings annuity and the value derived pursuant to the section 7520 tables in sustaining the latter valuation. But that determination was based upon its prior determination, following its holding in <u>Cook</u>, that such large

valuation disparities, if they result from marketability or transferability restrictions, are to be ignored, a position that the Courts of Appeals for both the Second and Ninth Circuits have rejected, and that the Court of Appeals for the Fifth Circuit itself has indicated should not be followed in determining the application of the section 7520 tables to a capital asset rather than an annuity.

In this case, sales of the SMI and an appraisal commissioned by the University (University appraisal) all indicate that the actual fair market value of the SMI, within a timeframe stretching from approximately 18 months before RERI's August 27, 2003, gift of the SMI to the University to 2 years and 4 months thereafter, was substantially less than Mr. Gelbtuch's $32,935,000 valuation of the hypothetical remainder interest in the Hawthorne property using the section 7520 tables.

The relevant sales (and valuation) of the SMI are as follows:

(1)  February 7, 2002:  Red Sea's sale of the SMI to RJS for $1,610,000.

(2)  March 25, 2002:  RJS' sale of the SMI to RERI for $2,950,000.

(3)  July 20, 2005:  the University appraisal determining the value of a remainder interest in the Hawthorne property to be $6.5 million.

(4) On or about December 23, 2005: the University's sale of the SMI to HRK for $1,940,000.

(5) December 26, 2005: purported sale of the SMI by HRK to an unidentified purchaser for $3 million.

All four of the foregoing sales were for amounts substantially below Mr. Gelbtuch's appraised value of a hypothetical remainder interest in the Hawthorne property, determined using the section 7520 tables. The sales were for amounts ranging from approximately 5% to 9% of Mr. Gelbtuch's $32,935,000 appraisal, and the University appraisal was for an amount approximately 20% of that appraisal. Even with allowances for market fluctuations during the approximately 3-year, 10-month period of the foregoing transactions, the huge disparity between the SMI's fair market value as determined by actual sales and an independent valuation and its value based on Mr. Gelbtuch's appraisal is prima facie violative of the unrealistic and unreasonable fair market value standard.[19] Moreover, the

[19]With regard to the presence of significant market fluctuations, we note that Mr. Gelbtuch made a second appraisal of the Hawthorne property and a hypothetical remainder interest therein as of December 26, 2006, in which he concluded that the fair market value of the property was $64,185,000 and that of the hypothetical remainder interest (per the sec. 7520 tables) was $29,930,000. That reflects an increase in the property's appraised value and a decrease (due to application of a lower discount rate) in the hypothetical remainder interest's value, as compared with Mr. Gelbtuch's appraisal (as of August 28, 2003), in which he

(continued...)

reason for the disparity is of no consequence.  If the end result is a disparity of the foregoing magnitude between actual fair market value and value derived by applying the section 7520 tables, the tables are inapplicable under the unrealistic and unreasonable fair market value standard.

Neither party has directly addressed this issue of actual versus derived (per the section 7520 tables) value.  Respondent cites caselaw acknowledging the relevance of the unrealistic and unreasonable fair market value standard.  Petitioner attempts to refute respondent's argument for nonapplication of the section 7520 tables on the ground that each of the risks and contingencies identified by respondent is either remote (and, therefore, to be disregarded) or irrelevant.  We find nothing in the record before us that definitively explains the foregoing large disparity in values.  It may be attributable to one or more of the restrictions or contingencies discussed supra, but, for the reasons stated, that

---

[19](...continued)
found those values to be $55,000,000 and $32,935,000, respectively (using a remainder factor of 0.598793705 to calculate the value of the hypothetical remainder interest).  For the later appraisal, Mr. Gelbtuch was "advised that the applicable Remainder Interest Discount Rate as provided in Section 7520 of the Internal Revenue Code of 1986 for the month of contribution is 5.6 percent."  Petitioner has not reconciled for us the use of a smaller factor to calculate the value of a remainder that was less distant.  In any event, the two appraisals do not differ significantly as regards the valuation of the remainder interest, and the lower appraisal is still some $27 to $28 million higher that the amounts for which the SMI was twice sold on or about the "as of" appraisal date.

determination must await the resolution of unresolved issues of fact. Also, it may be attributable to the fact, discussed <u>supra</u>, that, compared to the application of the section 7520 tables to Holdings' (based on Hawthorne's) net asset value to determine the value of the SMI, the application of the section 7520 tables to the value of the Hawthorne property without taking into account the burden of the mortgage on that property produces a value for a hypothetical remainder interest in the Hawthorne property that is not reflective of the value of the SMI. If so, adjustment would have to be made for that liability or the value of a hypothetical remainder interest in the Hawthorne property would have to be rejected as a substitute for the value of the SMI. It also may reflect the fact that the foregoing sales of the SMI were not intended to be truly reflective of the SMI's fair market value on the dates of sale.[20]

---

[20]RERI's contribution of the SMI to the University resulted in a claimed deduction far in excess of RERI's investment therein. That contribution was followed by the University's sale of the SMI to HRK and HRK's resale of it, which was followed, ultimately, by the last purchaser's contribution of the SMI to another charitable organization, again allegedly resulting in a large deduction in excess of either HRK's or the donor's investment. That chain of events suggests the presence of a scheme to generate large deductions, through application of the sec. 7520 tables, for multiple charitable contributions of the same asset, in which each of the donors made a small investment. Such a scheme at least suggests tax shelter aspects that the parties may want to address at trial and on brief.

In any event, the issue of whether the disparity between the SMI's value based upon the University appraisal and the sales of the SMI both before and after its contribution to the University, and its value based upon the Gelbtuch appraisal using the section 7520 tables results in a violation of the unrealistic and unreasonable fair market value standard is also an unresolved issue of material fact.

### 4. Conclusion

Because there remain genuine disputes as to material facts, we will deny the motion to the extent that respondent asks us to rule that the section 7520 tables do not apply to value the SMI.

## III. Whether the Gelbtuch Appraisal Was a Qualified Appraisal

### A. Applicable Law

As noted supra, section 170(a)(1) allows a charitable contribution deduction, but only if the contribution is "verified under regulations prescribed by the Secretary." The Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98-369, sec. 155, 98 Stat. at 691, ordered the Secretary to prescribe regulations under section 170(a)(1) requiring a taxpayer claiming a deduction for a contribution of property worth more than $5,000 to "obtain [and retain] a qualified appraisal for the property contributed", attach an "appraisal summary" to the return reporting

the deduction, and "include on such return such additional information * * * as the Secretary may prescribe in such regulations." See DEFRA sec. 155(a)(1). DEFRA defines a "qualified appraisal" as one prepared by a "qualified appraiser" that includes:

(A)  a description of the property appraised,

(B)  the fair market value of such property on the date of contribution and the specific basis for the valuation,

(C)  a statement that such appraisal was prepared for income tax purposes,

(D)  the qualifications of the qualified appraiser,

(E)  the signature and TIN of such appraiser, and

(F)  such additional information as the Secretary prescribes in such regulations.
[Id. para. (4), 98 Stat. at 692.]

In response to that directive, the Secretary issued section 1.170A-13(c), Income Tax Regs. (sometimes, DEFRA regulations),[21] applicable to charitable

---

[21]The DEFRA regulations govern this case.  Congress largely codified those regulations in 2004 by enacting sec. 170(f)(11) as part of the American Jobs Creation Act of 2004 (AJCA), Pub. L. No. 108-357, sec. 883(a), 118 Stat. at 1631. That provision, which, unlike the DEFRA regulations, contains a "reasonable cause" exception for failure to comply with its terms, applies to contributions made after June 3, 2004.  See AJCA sec. 883(b), 118 Stat. at 1632.  Therefore, it does not apply to the 2003 contribution at issue herein.

contributions of property in excess of $5,000 by certain taxpayers, including individuals and partnerships, after December 31, 1984.

Section 1.170A-13(c)(1)(i), Income Tax Regs., provides, in pertinent part: "No deduction under section 170 shall be allowed * * * [for a covered contribution] unless the substantiation requirements described in paragraph (c)(2) of this section are met." Paragraph (c)(2)(i)(A) requires the donor-taxpayer to "[o]btain a qualified appraisal (as defined in paragraph (c)(3) of this section) for * * * [the] property contributed." Paragraph (c)(3)(i) describes a "qualified appraisal", in pertinent part, as "an appraisal document that * * * [i]ncludes the information required by paragraph (c)(3)(ii) of this section". Paragraph (c)(3)(ii) lists among the items of information that a qualified appraisal "shall include":

(A) A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

* * * * * * *

(D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that--

(1) Restricts temporarily or permanently a donee's right to use or dispose of the donated property,

(2)    Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a donee organization in cooperative fundraising) any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire, * * *

*        *        *        *        *        *        *

(I)    The appraised fair market value (within the meaning of § 1.170A-1(c)(2)) of the property on the date (or expected date) of contribution;

(J)    The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

(K)    The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.

Under certain circumstances, "substantial compliance" with the requirements for a qualified appraisal will be sufficient to consider an appraisal qualified within the meaning of DEFRA sec. 155(a)(1) and (4) and section 1.170A-13(c)(3), Income Tax Regs.  See Bond v. Commissioner, 100 T.C. 32, 41-42 (1993), in which we determined that the taxpayers' failure "to obtain and attach to their return a separate written appraisal containing the information specified in respondent's regulations" constituted a violation of "procedural or directory"

requirements as apposed to mandatory requirements that go to "the essence of the thing to be done" and, therefore, are "a precondition to an effective election." We held that, where all of the procedural defects concerning the appraisal and the appraiser were corrected either on the Form 8283, Noncash Charitable Contributions (the appraisal summary attached to the return),[22] or at or near the commencement of the audit, the taxpayers "substantially complied with section 1.170-13A, Income Tax Regs., and are entitled to the charitable deduction claimed." Id. at 41-42. Compare Hewitt v. Commissioner, 109 T.C. 258 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998), in which we declined to extend Bond to circumstances in which the taxpayers neither obtained an appraisal nor attached an appraisal summary to their return. See also Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, in which we found that an appraisal did not constitute a qualified appraisal of the contributed property (72% of the stock of a corporation) because it was an appraisal of the assets of the corporation, not of the contributed shares. In Estate of Evenchik, we relied upon our decision in Smith v. Commissioner, T.C. Memo. 2007-368, 2007 WL 4410771, aff'd, 364 Fed. Appx. 317 (9th Cir. 2009), which involved charitable

---

[22]See also Simmons v. Commissioner, T.C. Memo. 2009-208, 2009 WL 2950610, at *7-*8, aff'd, 646 F.3d 6 (D.C. Cir. 2011), wherein we determined that defects in the appraisal could be cured by the Form 8283 attached to the return.

contributions of fractional interests in a family limited partnership (FLP), supported by an appraisal of the FLP's sole underlying asset, shares in a closely-held, family-owned C corporation. In Smith v. Commissioner, 2007 WL 4410771, at *20, we held that that and other violations of the reporting requirements in the DEFRA regulations resulted in the taxpayers' "failure to substantially comply or otherwise provide respondent with sufficient information to accomplish the statutory purpose" of enabling the Commissioner to "understand and monitor the claimed contributions".

B.    The Parties' Arguments

Respondent argues that, because Mr. Gelbtuch appraised the wrong property, his appraisal "does not present a method of valuation of the property contributed * * * [and] also fails to contain a specific basis for a method of valuation for the actual property conveyed to the University" in violation of section 1.170A-13(c)(3)(ii)(J) and (K), Income Tax Regs. Respondent further argues that, by submitting an appraisal that "does not describe the property transferred to the University", the Gelbtuch appraisal also violates the property description requirement of section 1.170A-13(c)(3)(ii)(A), Income Tax Regs., citing Smith and Estate of Evenchik.

Respondent also argues that, by failing to mention the two-year hold-sell requirement, the Gelbtuch appraisal violates the requirement in section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs., that a qualified appraisal include "[t]he terms of any agreement or understanding * * * by or on behalf of the donor or donee that * * * [r]estricts temporarily or permanently a donee's right to use or dispose of the donated property". In support of that argument, respondent cites our opinion in Rothman v. Commissioner, T.C. Memo. 2012-163, 2012 WL 2094306, vacated in part on reconsideration, T.C. Memo. 2012-218, 2012 WL 3101513, wherein we held that the taxpayers' appraisal of a historic preservation facade easement was not a qualified appraisal because, among other reasons, the appraisal did not adequately describe how, if at all, the restrictions on the taxpayer-homeowners' use of their home, resulting from their donation of the easement, "affected the fair market value of the encumbered subject property." Id., 2012 WL 2094306, at *11.

Respondent also points to other perceived deficiencies in the Gelbtuch appraisal: its failure to take into account (1) AT&T's right to "remove the improvements made to the Hawthorne property should it elect not to exercise the five year options" and (2) the "mortgage and depreciation on the Hawthorne property". Respondent apparently views those disclosure omissions as additional

failures to disclose restrictions on the use or disposition of the property in violation of section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs.  In connection with Mr. Gelbtuch's failure to address the potential impact of the mortgage on the value of the Hawthorne property, respondent cites our opinion in Rothman, wherein we suggest that an appraisal's failure to reveal the existence and terms of a mortgage on the donated property may, by itself, 2012 WL 3101513, at *4, or in conjunction with other defects, 2012 WL 2094306, at *14, render an appraisal unqualified under the DEFRA regulations.

In addition, respondent points to the Gelbtuch appraisal's determination of the SMI's "investment value" rather than its fair market value as a violation of section 1.170A-13(c)(3)(ii)(I), Income Tax Regs., which requires that the appraisal "shall include * * * the appraised fair market value * * * of the property on the date * * * of contribution".

Lastly, respondent argues that the Gelbtuch appraisal is not a qualified appraisal because it grossly overvalues a hypothetical remainder interest in the Hawthorne property.

In response to respondent's argument that the Gelbtuch appraisal fails to constitute a qualified appraisal because it values the wrong property interest, petitioner argues:  "Regardless of whether Pierre applies [to prevent looking

through Holdings (and Hawthorne) to its sole, income-producing asset, the Hawthorne property], the only way to value a single member LLC is by valuing the underlying assets." He distinguishes Smith and Estate of Evenchik on the ground that both involved contributions of partial interests in the entities (in Smith, an FLP, in Estate of Evenchik, a corporation) owning the underlying assets that were actually appraised.[23]

Petitioner also argues that Mr. Gelbtuch's failure to mention the gift agreement containing the two-year hold-sell requirement does not warrant a conclusion that the Gelbtuch appraisal failed to substantially comply with the requirements for a qualified appraisal. He bases that argument on the fact that petitioner gave the gift agreement to the agent at the beginning of the audit and that respondent "had sufficient information to determine whether an audit was necessary as intended by the purpose of the regulations." Petitioner also repeats his argument, made in defending the application of the section 7520 tables herein,

---

[23]Petitioner attempts to further distinguish Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, on the ground that, in this case but not in Estate of Evenchik, the donated asset (i.e., the SMI) "was accurately described on [F]orm 8283 as required by the regulations and supplied the necessary information to allow the Commissioner to assess the donation and whether an audit was necessary." That is not a valid distinction, since, in Estate of Evenchik, we specifically found that the Form 8283 did describe the donated property: "15,534.67 shares Chateau Apartments, Inc. common stock". Id. at *4.

that, because the two-year hold-sell requirement set forth in the gift agreement was not a condition of the donation, i.e., it did not interfere with the University's ownership of or right to sell the SMI at any time, "there was no articulated or perceived consequences to any violation of the agreement. Regardless of subsequent events, Ross was still obligated to give $5 million to the University."

In response to respondent's argument that Mr. Gelbtuch's failure to mention either the mortgage or AT&T's right to remove improvements violated the requirement in section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs., that a qualified appraisal disclose "the terms of any agreement or understanding * * * [restricting] a donee's right to use or dispose of the donated property", petitioner argues that (1) AT&T had no right to remove improvements and (2) even if it did, neither that right nor the mortgage arose out of "any agreement or understanding entered into * * * by or on behalf of the donor or donee" as required by the foregoing regulation.

Petitioner also disputes respondent's argument that the Gelbtuch appraisal is fatally flawed because it fails to compute the SMI's fair market value, but, instead computes the "investment value" of a remainder interest in the Hawthorne property. Petitioner points out that, in the case of a remainder interest in real property (in petitioner's view, the asset properly valued pursuant to the "check-the-

box" regulations), pursuant to section 170(f)(4), section 1.170A-12(c), Income

Tax Regs., and section 25.2512-5(d), Gift Tax Regs., fair market value is "present

value" as determined under the section 7520 tables.  See sec. 25.2512-5(d)(2)(ii),

Gift Tax Regs.[24]

C.    Analysis

1.    Appraisal of the Wrong Property

We agree with petitioner that both Estate of Evenchik and Smith, upon

which respondent places principal reliance, are distinguishable.  As petitioner

points out, both cases concerned contributions of partial interests in entities

holding the property that was actually appraised.  In Smith, the contributions were

of minority interests in three FLPs (and were, therefore, presumably subject to

---

[24]At the conclusion of his response to the motion, petitioner concedes that, if we find Pierre v. Commissioner, 133 T.C. 24 (2009), applicable to this case, a new appraisal (of the SMI) would be required.  It would appear, however, that a new appraisal at this or any future time could not constitute a qualified appraisal, which, pursuant to sec. 1.170A-13(c)(3)(iv)(B), Income Tax Regs., must have been "received by the donor before the due date (including extensions) of * * * [RERI's 2003 return]".  See also Jorgenson v. Commissioner, T.C. Memo. 2000-38, 2000 WL 134332, at *4, *8 (failure to obtain a qualified appraisal before the return due date was not cured by submission to the IRS of letters drafted by two appraisers after the return was filed).  As discussed infra, however, if petitioner is able to persuade us that there is no difference in value between the SMI and a hypothetical remainder interest in the Hawthorne property and that the latter was properly appraised, we would conclude that the Gelbtuch appraisal constituted a qualified appraisal despite our determination that Pierre requires an appraisal of the former.

minority and, perhaps, marketability discounts) and, in Estate of Evenchik, the taxpayer contributed a 72% interest in a corporation, the value of which 72% interest, the parties stipulated, was only 65% of the value reported. Estate of Evenchik v. Commissioner, at *5 n.3. In this case, petitioner transferred a future interest (the SMI) in Holdings, whose sole asset was (indirectly) the Hawthorne property. Disregarding for the moment Hawthorne's liabilities, whether the section 7520 tables are applied to the value of Holdings to determine the value of the SMI or are applied to the value of the Hawthorne property to determine the value of a hypothetical remainder interest therein at the end of a term equal to the duration of the SMI, the resulting values should be equal. Moreover, any confusion respondent might have had regarding the property actually donated to the University was eliminated by the Form 8283 attached to RERI's 2003 return, which identified the SMI as the property contributed and clarified Holdings' indirect interest, through Hawthorne, of 100% ownership of the Hawthorne property. In the circumstances of this case, we attach more weight to the Form 8283 than we did in Estate of Evenchik, where the Form 8283 also identified the actual property contributed, which, as noted supra, was not equal in value to the appraised property. Assuming the evidence in this case demonstrates that the SMI and the remainder interest in the Hawthorne property were of equal value, we

would find that the inclusion, in the Form 8283, of the missing information required to be included in the appraisal by section 1.170A-13(c)(3)(ii)(A), Income Tax Regs., i.e., a description of the property actually donated to the University, constituted substantial compliance with that provision. We believe that result is consistent with the requirement, embodied in DEFRA, that a qualified appraisal provide sufficient return information in support of the claimed valuation so as "to enable respondent to deal more effectively with the prevalent use of overvaluations", which we have described as DEFRA's principal objective. See Hewitt v. Commissioner, 109 T.C. at 265. See also Simmons v. Commissioner, T.C. Memo. 2009-208, 2009 WL 2950610, at *8, aff'd, 646 F.3d 6 (D.C. Cir. 2011), wherein we determined that information included in the Form 8283 was sufficient to cure the appraisal's omissions of required information.

We find that Mr. Gelbtuch's appraisal of the hypothetical remainder interest in the Hawthorne property, rather than of the SMI, does not, in and of itself, prevent his appraisal from constituting a qualified appraisal under section 1.170A-13(c)(3), Income Tax Regs. Rather, the issue of whether that appraisal constitutes a qualified appraisal turns on whether we may reasonably conclude that its failure to take into account restrictions and encumbrances applicable to either the SMI or

the Hawthorne property that are cited by respondent rendered it an unacceptable alternative to a direct appraisal of the SMI.

2.    The Appraisal's Failure To Consider the Two-Year Hold-Sell Requirement

The two-year hold-sell requirement is a restriction on the disposition of the SMI, not of the hypothetical remainder interest in the Hawthorne property. As such, it creates two potential problems for petitioner. First, it may mean that the section 7520 tables, applied by Mr. Gelbtuch to determine the value of a hypothetical remainder interest in the Hawthorne property, may not be applicable to determine the fair market value of the SMI. See sec. 1.7520-3(b)(1)(ii), Income Tax Regs. ("In general, standard section 7520 * * * remainder factor may not be used to value a restricted beneficial interest."). In that case, the Gelbtuch appraisal would be irrelevant. Second, on its face, the appraisal's failure to mention the restriction may disqualify the appraisal as a substitute for an actual appraisal of the SMI because the omission constitutes a violation of the directive in section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs., that the appraisal inform as to "[t]he terms of any agreement or understanding entered into * * * by or on behalf of the donor or donee that * * * [r]estricts temporarily * * * a donee's right to * * * dispose of the donated property".

We have determined supra that Mr. Ross' right to renege on all or part of his $5 million pledge to the University, should it violate the two-year hold-sell requirement, raises an unresolved issue of State law and, therefore, an issue of material fact as to the economic impact on the University had it violated that requirement. We also have determined that there are additional issues of material fact concerning the adverse impact, if any, on the value of the SMI in the University's hands should it either violate or, alternatively, observe the two-year hold-sell requirement. Those unresolved factual inquiries are relevant because we conclude that an appraisal's failure to take into account the terms of a restriction described in section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs., does not automatically result in the failure of that appraisal to constitute a qualified appraisal. We find it implicit in that provision that such a result is justified only if the omission relates to a restriction that reasonably can be said to have some adverse impact on the value of the donated asset. Otherwise, as we stated in the context of considering whether the section 7520 tables may apply herein, it is a case of no harm-no foul, and the omission may be disregarded.[25]

---

[25]Our conclusion in that regard is consistent with our determination herein that an appraisal of the "wrong" property might not be fatal to the appraisal's status as a qualified appraisal if the "wrong" property is shown to have (or potentially have) a value no different from that of the donated property.

3.      The Appraisal's Failure To Consider AT&T's Right of Removal on Lease Termination

The lease agreement between Intergate and AT&T provides that,

> upon the expiration or termination of this Lease, all improvements and additions to the Premises except * * * [cabling and wiring included within the scope of AT&T's work, its alterations from all interstitial/ceiling plenum areas, furniture, equipment and personal property, and back-up generators and associated equipment] shall be deemed property of Landlord and shall not be removed by Tenant from the Premises.

All or most of the "improvements" that AT&T has a right to remove would appear to be either personal property or easily removable fixtures, which also constitute or are akin to personal property, rather than significant improvements to the premises. Thus, it appears that AT&T's right of removal is quite limited and probably of little or no effect on the value of the Hawthorne property. The relevant point, however, is that the parties' dispute regarding the impact of AT&T's right of removal on the Hawthorne property's value raises an issue as to whether the Gelbtuch appraisal overvalued the Hawthorne property, not an issue as to whether it constituted a qualified appraisal. Mr. Gelbtuch's failure to assess the valuation impact, if any, of AT&T's right of removal does not violate any of the requirements of section 1.170A-13(c)(3), Income Tax Regs., for a qualified appraisal. We disagree with respondent's argument that the Gelbtuch appraisal's

failure to disclose AT&T's limited right of removal constituted a failure to disclose "significant terms and conditions affecting the use and disposition of * * * [the SMI]" in violation of section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs. It does not seem possible that AT&T's removal of what is largely, if not exclusively, personal property would, in any way, interfere with the subsequent use or disposition of the building. Most importantly, however, we agree with petitioner that AT&T's right of removal, being a term of the lease between Intergate and AT&T, did not constitute a term of an "agreement * * * entered into * * * by or on behalf of the donor or donee" as required by the foregoing regulation. Therefore, the impact of AT&T's right of removal is not germane to the qualified appraisal issue.

4.    The Appraisal's Failure To Consider the Mortgage or Depreciation on the Hawthorne Property

Mr. Gelbtuch's failure to consider the mortgage on the Hawthorne property in his appraisal thereof also does not constitute an omission of "[t]he terms of * * * [an] agreement * * * entered into * * * by or on behalf of the donor or donee", as required by section 1.170A-13(c)(3)(ii)(D)(1), Income Tax Regs. Rather it was part of the deed of trust executed by Hawthorne (the borrower), Commonwealth Land Title Insurance Co., and BB&T (the lender), which secured

the loan that financed Hawthorne's purchase of the Hawthorne property. Therefore, that failure, like Mr. Gelbtuch's failure to consider AT&T's right of removal, relates to the accuracy of the Gelbtuch appraisal. It is not germane to the issue of whether it was a qualified appraisal under the DEFRA regulations.

Similarly, Mr. Gelbtuch's failure to discuss the potential impact of depreciation on the Hawthorne property is not an omission covered by the foregoing regulation. Therefore, it too is not germane to the qualified appraisal issue.[26]

> 5.   Mr. Gelbtuch's Finding of "Investment Value" Rather Than Fair Market Value

In his appraisal, Mr. Gelbtuch does refer to the value he assigns to the hypothetical remainder interest in the Hawthorne property as its "investment value", for which he provides the following dictionary definition:  "The specific value of an investment to a particular investor or class of investors based on individual investment requirements; distinguished from market value, which is impersonal and detached."  As defined by Mr. Gelbtuch, the term "investment value" appears to be unrelated to the value that he actually derives for the

---

[26]Respondent does not argue nor do we find that a failure to discuss depreciation constitutes a failure to discuss "the physical condition of the property", in violation of sec. 1.170A-13(c)(3)(ii)(B), Income Tax Regs.

hypothetical remainder interest in the Hawthorne property. We agree with petitioner that Mr. Gelbtuch's method for valuing a hypothetical remainder interest in the Hawthorne property was in accordance with section 170(f)(4), section 1.170A-12(c), Income Tax Regs., and section 25.2512-5(d)(2)(ii), Gift Tax Regs., to the extent that, when read together, those provisions require that the valuation of a remainder interest in real property be made by applying the section 7520 tables to the fair market value of the property.[27] That Mr. Gelbtuch mislabeled his valuation of a hypothetical remainder interest as its "investment value" is of no consequence.[28]

Moreover, as in the case of Mr. Gelbtuch's failure to discuss the mortgage, depreciation of the Hawthorne property, or AT&T's right of removal, an allegedly improper valuation of the donated property is not something that would result in Mr. Gelbtuch's appraisal's not constituting a qualified appraisal under the DEFRA regulations.

---

[27]Mr. Gelbtuch did not take into account depreciation in valuing the hypothetical remainder in the Hawthorne property, which, like his failure to consider the mortgage, goes to the accuracy of his appraisal.

[28]    What's in a name? that which we call a rose
        By any other name would smell as sweet;

William Shakespeare, Romeo and Juliet, act 2, sc. 2.

6.    Alleged Gross Overvaluation of the Hypothetical Remainder Interest in the Hawthorne Property

Respondent argues that Mr. Gelbtuch grossly overvalued the hypothetical remainder interest in the Hawthorne property (apparently assuming, for the sake of argument, that it may be considered a proxy for the SMI) in the light of the much smaller amounts paid for the SMI in a series of sales thereof both shortly before and after RERI's donation of it to the University.  Once again, respondent's argument is inapposite as it goes to the accuracy of Mr. Gelbtuch's appraisal, not to its status as a qualified appraisal under the DEFRA regulations.

D.    Conclusion

Respondent's arguments in support of his motion for partial summary judgment that the Gelbtuch appraisal fails to satisfy the DEFRA regulations' definition of (and, therefore, does not constitute) a qualified appraisal are either inapposite or involve unresolved disputes of material fact.  Therefore, we will deny the motion to the extent respondent asks us to rule that petitioner failed to substantiate the value of the SMI with a qualified appraisal.

An appropriate order will be issued denying respondent's motion for partial summary judgment.